[S.F. No. 23042. July 1, 1976.]

VITALY TARASOFF et al., Plaintiffs and Appellants, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

428

**COUNSEL**

George Alexander McKray for Plaintiffs and Appellants.

Robert E. Cartwright, Floyd A. Demanes, William H. Lally, Edward I. Pollock, Leonard Sacks, Stephen I. Zetterberg, Sanford M. Gage, Robert O. Angle and Melanie Bellah as Amici Curiae on behalf of Plaintiffs and Appellants.

Ericksen, Ericksen, Lynch, Mackenroth & Arbuthnot, Ericksen, Ericksen, Lynch & Mackenroth, Ericksen, Ericksen, Lynch, Young & Mack-

enroth, William R. Morton, Richard G. Logan, Hanna, Brophy, MacLean, McAleer & Jensen, Hanna & Brophy and James V. Burchell for Defendants and Respondents.

Evelle J. Younger, Attorney General, James E. Sabine, Assistant Attorney General, John M. Morrison and Thomas K. McGuire, Deputy Attorneys General, John H. Larson, County Counsel (Los Angeles), Daniel D. Mikesell, Jr., Deputy County Counsel, Richard J. Moore, County Counsel (Alameda), Charles L. Harrington, Deputy County Counsel, Musick, Peeler & Garrett, James E. Ludlam, Severson, Werson, Berke & Melchior, Kurt W. Melchior, Nicholas S. Freud and Jan. T. Chilton as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**TOBRINER, J.**—On October 27, 1969, Prosenjit Poddar killed Tatiana Tarasoff.[1] Plaintiffs, Tatiana's parents, allege that two months earlier Poddar confided his intention to kill Tatiana to Dr. Lawrence Moore, a psychologist employed by the Cowell Memorial Hospital at the University of California at Berkeley. They allege that on Moore's request, the campus police briefly detained Poddar, but released him when he appeared rational. They further claim that Dr. Harvey Powelson, Moore's superior, then directed that no further action be taken to detain Poddar. No one warned plaintiffs of Tatiana's peril.

Concluding that these facts set forth causes of action against neither therapists and policemen involved, nor against the Regents of the University of California as their employer, the superior court sustained defendants' demurrers to plaintiffs' second amended complaints without leave to amend.[2] This appeal ensued.

---

[1]The criminal prosecution stemming from this crime is reported in *People* v. *Poddar* (1974) 10 Cal.3d 750 [111 Cal.Rptr. 910, 518 P.2d 342].

[2]The therapist defendants include Dr. Moore, the psychologist who examined Poddar and decided that Poddar should be committed; Dr. Gold and Dr. Yandell, psychiatrists at Cowell Memorial Hospital who concurred in Moore's decision; and Dr. Powelson, chief of the department of psychiatry, who countermanded Moore's decision and directed that the staff take no action to confine Poddar. The police defendants include Officers Atkinson, Brownrigg and Halleran, who detained Poddar briefly but released him; Chief Beall, who received Moore's letter recommending that Poddar be confined; and Officer Teel, who, along with Officer Atkinson, received Moore's oral communication requesting detention of Poddar.

Plaintiffs' complaints predicate liability on two grounds: defendants' failure to warn plaintiffs of the impending danger and their failure to bring about Poddar's confinement pursuant to the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 *ff.*) Defendants, in turn, assert that they owed no duty of reasonable care to Tatiana and that they are immune from suit under the California Tort Claims Act of 1963 (Gov. Code, § 810 *ff.*).

We shall explain that defendant therapists cannot escape liability merely because Tatiana herself was not their patient. **(1)** When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances.

In the case at bar, plaintiffs admit that defendant therapists notified the police, but argue on appeal that the therapists failed to exercise reasonable care to protect Tatiana in that they did not confine Poddar and did not warn Tatiana or others likely to apprise her of the danger. Defendant therapists, however, are public employees. Consequently, to the extent that plaintiffs seek to predicate liability upon the therapists' failure to bring about Poddar's confinement, the therapists can claim immunity under Government Code section 856. No specific statutory provision, however, shields them from liability based upon failure to warn Tatiana or others likely to apprise her of the danger, and Government Code section 820.2 does not protect such failure as an exercise of discretion.

Plaintiffs therefore can amend their complaints to allege that, regardless of the therapists' unsuccessful attempt to confine Poddar, since they knew that Poddar was at large and dangerous, their failure to warn Tatiana or others likely to apprise her of the danger constituted a breach of the therapists' duty to exercise reasonable care to protect Tatiana.

Plaintiffs, however, plead no relationship between Poddar and the police defendants which would impose upon them any duty to Tatiana, and plaintiffs suggest no other basis for such a duty. Plaintiffs have,

therefore, failed to show that the trial court erred in sustaining the demurrer of the police defendants without leave to amend.

### 1. *Plaintiffs' complaints*

Plaintiffs, Tatiana's mother and father, filed separate but virtually identical second amended complaints. The issue before us on this appeal is whether those complaints now state, or can be amended to state, causes of action against defendants. We therefore begin by setting forth the pertinent allegations of the complaints.[3]

Plaintiffs' first cause of action, entitled "Failure to Detain a Dangerous Patient," alleges that on August 20, 1969, Poddar was a voluntary outpatient receiving therapy at Cowell Memorial Hospital. Poddar informed Moore, his therapist, that he was going to kill an unnamed girl, readily identifiable as Tatiana, when she returned home from spending the summer in Brazil. Moore, with the concurrence of Dr. Gold, who had initially examined Poddar, and Dr. Yandell, assistant to the director of the department of psychiatry, decided that Poddar should be committed for observation in a mental hospital. Moore orally notified Officers Atkinson and Teel of the campus police that he would request commitment. He then sent a letter to Police Chief William Beall requesting the assistance of the police department in securing Poddar's confinement.

Officers Atkinson, Brownrigg, and Halleran took Poddar into custody, but, satisfied that Poddar was rational, released him on his promise to stay away from Tatiana. Powelson, director of the department of psychiatry at Cowell Memorial Hospital, then asked the police to return Moore's letter, directed that all copies of the letter and notes that Moore had taken as therapist be destroyed, and "ordered no action to place Prosenjit Poddar in 72-hour treatment and evaluation facility."

---

[3]Plaintiffs' complaints allege merely that defendant therapists failed to warn plaintiffs —Tatiana's parents—of the danger to Tatiana. The complaints do not allege that defendant therapists failed to warn Tatiana herself, or failed to warn persons other than her parents who would be likely to apprise Tatiana of the danger. Such omissions can properly be cured by amendment. As we stated in *Minsky* v. *City of Los Angeles* (1974) 11 Cal.3d 113, 118-119 [113 Cal.Rptr. 102, 520 P.2d 726]: "It is axiomatic that if there is a reasonable possibility that a defect in the complaint can be cured by amendment or that the pleading liberally construed can state a cause of action, a demurrer should not be sustained without leave to amend." (Accord, *La Sala* v. *American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 876 [97 Cal.Rptr. 849, 489 P.2d 1113]; *Lemoge Electric* v. *County of San Mateo* (1956) 46 Cal.2d 659, 664 [297 P.2d 638]; *Beckstead* v. *Superior Court* (1971) 21 Cal.App.3d 780, 782 [98 Cal.Rptr. 779].)

Plaintiffs' second cause of action, entitled "Failure to Warn On a Dangerous Patient," incorporates the allegations of the first cause of action, but adds the assertion that defendants negligently permitted Poddar to be released from police custody without "notifying the parents of Tatiana Tarasoff that their daughter was in grave danger from Posenjit Poddar." Poddar persuaded Tatiana's brother to share an apartment with him near Tatiana's residence; shortly after her return from Brazil, Poddar went to her residence and killed her.

Plaintiffs' third cause of action, entitled "Abandonment of a Dangerous Patient," seeks $10,000 punitive damages against defendant Powelson. Incorporating the crucial allegations of the first cause of action, plaintiffs charge that Powelson "did the things herein alleged with intent to abandon a dangerous patient, and said acts were done maliciously and oppressively."

Plaintiffs' fourth cause of action, for "Breach of Primary Duty to Patient and the Public," states essentially the same allegations as the first cause of action, but seeks to characterize defendants' conduct as a breach of duty to safeguard their patient and the public. Since such conclusory labels add nothing to the factual allegations of the complaint, the first and fourth causes of action are legally indistinguishable.

As we explain in part 4 of this opinion, plaintiffs' first and fourth causes of action, which seek to predicate liability upon the defendants' failure to bring about Poddar's confinement, are barred by governmental immunity. Plaintiffs' third cause of action succumbs to the decisions precluding exemplary damages in a wrongful death action. (See part 6 of this opinion.) We direct our attention, therefore, to the issue of whether plaintiffs' second cause of action can be amended to state a basis for recovery.

2. ▮▮▮ *Plaintiffs can state a cause of action against defendant therapists for negligent failure to protect Tatiana.*

The second cause of action can be amended to allege that Tatiana's death proximately resulted from defendants' negligent failure to warn Tatiana or others likely to apprise her of her danger. Plaintiffs contend that as amended, such allegations of negligence and proximate causation, with resulting damages, establish a cause of action. Defendants, however, contend that in the circumstances of the present case they owed no duty of care to Tatiana or her parents and that, in the absence of such

duty, they were free to act in careless disregard of Tatiana's life and safety.

In analyzing this issue, we bear in mind that legal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done. As stated in *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]: "The assertion that liability must . . . be denied because defendant bears no 'duty' to plaintiff 'begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. . . . [Duty] is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' (Prosser, Law of Torts [3d ed. 1964] at pp. 332-333.)"

In the landmark case of *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], Justice Peters recognized that liability should be imposed "for injury occasioned to another by his want of ordinary care or skill" as expressed in section 1714 of the Civil Code. ■ Thus, Justice Peters, quoting from *Heaven* v. *Pender* (1883) 11 Q.B.D. 503, 509 stated: " 'whenever one person is by circumstances placed in such a position with regard to another . . . that if he did not use ordinary care and skill in his own conduct . . . he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger.' "

We depart from "this fundamental principle" only upon the "balancing of a number of considerations"; major ones "are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved."[4]

The most important of these considerations in establishing duty is foreseeability. ■ As a general principle, a "defendant owes a duty of

[4]See *Merrill* v. *Buck* (1962) 58 Cal.2d 552, 562 [25 Cal.Rptr. 456, 375 P.2d 304]; *Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358]; *Walnut Creek Aggregates Co.* v. *Testing Engineers Inc.* (1967) 248 Cal.App.2d 690, 695 [56 Cal.Rptr. 700].

care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous." (*Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 399 [115 Cal.Rptr. 765, 525 P.2d 669]; *Dillon* v. *Legg, supra,* 68 Cal.2d 728, 739; *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40 [123 Cal.Rptr. 468, 539 P.2d 36]; see Civ. Code, § 1714.) As we shall explain, however, when the avoidance of foreseeable harm requires a defendant to control the conduct of another person, or to warn of such conduct, the common law has traditionally imposed liability only if the defendant bears some special relationship to the dangerous person or to the potential victim. Since the relationship between a therapist and his patient satisfies this requirement, we need not here decide whether foreseeability alone is sufficient to create a duty to exercise reasonable care to protect a potential victim of another's conduct.

█ Although, as we have stated above, under the common law, as a general rule, one person owed no duty to control the conduct of another[5] (*Richards* v. *Stanley* (1954) 43 Cal.2d 60, 65 [271 P.2d 23]; *Wright* v. *Arcade School Dist.* (1964) 230 Cal.App.2d 272, 277 [40 Cal.Rptr. 812]; Rest.2d Torts (1965) § 315), nor to warn those endangered by such conduct (Rest.2d Torts, *supra,* § 314, com. c.; Prosser, Law of Torts (4th ed. 1971) § 56, p. 341), the courts have carved out an exception to this rule in cases in which the defendant stands in some special relationship to either the person whose conduct needs to be controlled or in a relationship to the foreseeable victim of that conduct (see Rest.2d Torts, *supra,* §§ 315-320). Applying this exception to the present case, we note that a relationship of defendant therapists to either Tatiana or Poddar will suffice to establish a duty of care; as explained in section 315 of the Restatement Second of Torts, a duty of care may arise from either "(a) a special relation . . . between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation . . . between the actor and the other which gives to the other a right of protection."

---

[5]This rule derives from the common law's distinction between misfeasance and nonfeasance, and its reluctance to impose liability for the latter. (See Harper & Kime, *The Duty to Control the Conduct of Another* (1934) 43 Yale L.J. 886, 887.) Morally questionable, the rule owes its survival to "the difficulties of setting any standards of unselfish service to fellow men, and of making any workable rule to cover possible situations where fifty people might fail to rescue . . . ." (Prosser, Torts (4th ed. 1971) § 56, p. 341.) Because of these practical difficulties, the courts have increased the number of instances in which affirmative duties are imposed not by direct rejection of the common law rule, but by expanding the list of special relationships which will justify departure from that rule. (See Prosser, *supra,* § 56, at pp. 348-350.)

Although plaintiffs' pleadings assert no special relation between Tatiana and defendant therapists, they establish as between Poddar and defendant therapists the special relation that arises between a patient and his doctor or psychotherapist.[6] Such a relationship may support affirmative duties for the benefit of third persons. Thus, for example, a hospital must exercise reasonable care to control the behavior of a patient which may endanger other persons.[7] A doctor must also warn a patient if the patient's condition or medication renders certain conduct, such as driving a car, dangerous to others.[8]

Although the California decisions that recognize this duty have involved cases in which the defendant stood in a special relationship *both* to the victim and to the person whose conduct created the danger,[9] we do not think that the duty should logically be constricted to such situations. Decisions of other jurisdictions hold that the single relationship of a doctor to his patient is sufficient to support the duty to exercise reasonable care to protect others against dangers emanating from the patient's illness. The courts hold that a doctor is liable to persons

---

[6]The pleadings establish the requisite relationship between Poddar and both Dr. Moore, the therapist who treated Poddar, and Dr. Powelson, who supervised that treatment. Plaintiffs also allege that Dr. Gold personally examined Poddar, and that Dr. Yandell, as Powelson's assistant, approved the decision to arrange Poddar's commitment. These allegations are sufficient to raise the issue whether a doctor-patient or therapist-patient relationship, giving rise to a possible duty by the doctor or therapist to exercise reasonable care to protect a threatened person of danger arising from the patient's mental illness, existed between Gold or Yandell and Poddar. (See Harney, Medical Malpractice (1973) p. 7.)

[7]When a "hospital has notice or knowledge of facts from which it might reasonably be concluded that a patient would be likely to harm himself *or others* unless preclusive measures were taken, then the hospital must use reasonable care in the circumstances to prevent such harm." (*Vistica* v. *Presbyterian Hospital* (1967) 67 Cal.2d 465, 469 [62 Cal.Rptr. 577, 432 P.2d 193].) (Italics added.) A mental hospital may be liable if it negligently permits the escape or release of a dangerous patient (*Semler* v. *Psychiatric Institute of Washington, D.C.* (4th Cir. 1976) 44 U.S.L. Week 2439; *Underwood* v. *United States* (5th Cir. 1966) 356 F.2d 92; *Fair* v. *United States* (5th Cir. 1956) 234 F.2d 288). *Greenberg* v. *Barbour* (E.D.Pa. 1971) 322 F.Supp. 745, upheld a cause of action against a hospital staff doctor whose negligent failure to admit a mental patient resulted in that patient assaulting the plaintiff.

[8]*Kaiser* v. *Suburban Transportation System* (1965) 65 Wn.2d 461 [398 P.2d 14]; see *Freese* v. *Lemmon* (Iowa 1973) 210 N.W.2d 576 (concurring opn. of Uhlenhopp, J.).

[9]*Ellis* v. *D'Angelo* (1953) 116 Cal.App.2d 310 [253 P.2d 675], upheld a cause of action against parents who failed to warn a babysitter of the violent proclivities of their child; *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352], upheld a suit against the state for failure to warn foster parents of the dangerous tendencies of their ward; *Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938 [41 Cal.Rptr. 508], sustained a cause of action against a sheriff who had promised to warn decedent before releasing a dangerous prisoner, but failed to do so.

infected by his patient if he negligently fails to diagnose a contagious disease (*Hofmann* v. *Blackmon* (Fla.App. 1970) 241 So.2d 752), or, having diagnosed the illness, fails to warn members of the patient's family (*Wojcik* v. *Aluminum Co. of America* (1959) 18 Misc.2d 740 [183 N.Y.S.2d 351, 357-358]; *Davis* v. *Rodman* (1921) 147 Ark. 385 [227 S.W. 612, 13 A.L.R. 1459]; *Skillings* v. *Allen* (1919) 143 Minn. 323 [173 N.W. 663, 5 A.L.R. 922]; see also *Jones* v. *Stanko* (1928) 118 Ohio St. 147 [6 Ohio L.Abs. 77, 160 N.E. 456]).

Since it involved a dangerous mental patient, the decision in *Merchants Nat. Bank & Trust Co. of Fargo* v. *United States* (D.N.D. 1967) 272 F.Supp. 409 comes closer to the issue. The Veterans Administration arranged for the patient to work on a local farm, but did not inform the farmer of the man's background. The farmer consequently permitted the patient to come and go freely during nonworking hours; the patient borrowed a car, drove to his wife's residence and killed her. Notwithstanding the lack of any "special relationship" between the Veterans Administration and the wife, the court found the Veterans Administration liable for the wrongful death of the wife.

In their summary of the relevant rulings Fleming and Maximov conclude that the "case law should dispel any notion that to impose on the therapists a duty to take precautions for the safety of persons threatened by a patient, where due care so requires, is in any way opposed to contemporary ground rules on the duty relationship. On the contrary, there now seems to be sufficient authority to support the conclusion that by entering into a doctor-patient relationship the therapist becomes sufficiently involved to assume some responsibility for the safety, not only of the patient himself, but also of any third person whom the doctor knows to be threatened by the patient." (Fleming & Maximov, *The Patient or His Victim: The Therapist's Dilemma* (1974) 62 Cal.L.Rev. 1025, 1030.)

Defendants contend, however, that imposition of a duty to exercise reasonable care to protect third persons is unworkable because therapists cannot accurately predict whether or not a patient will resort to violence. In support of this argument amicus representing the American Psychiatric Association and other professional societies cites numerous articles which indicate that therapists, in the present state of the art, are unable reliably to predict violent acts; their forecasts, amicus claims, tend consistently to overpredict violence, and indeed are more often wrong

than right.[10] Since predictions of violence are often erroneous, amicus concludes, the courts should not render rulings that predicate the liability of therapists upon the validity of such predictions.

The role of the psychiatrist, who is indeed a practitioner of medicine, and that of the psychologist who performs an allied function, are like that of the physician who must conform to the standards of the profession and who must often make diagnoses and predictions based upon such evaluations. Thus the judgment of the therapist in diagnosing emotional disorders and in predicting whether a patient presents a serious danger of violence is comparable to the judgment which doctors and professionals must regularly render under accepted rules of responsibility.

We recognize the difficulty that a therapist encounters in attempting to forecast whether a patient presents a serious danger of violence. Obviously, we do not require that the therapist, in making that determination, render a perfect performance; the therapist need only exercise "that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of [that professional specialty] under similar circumstances." (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 788 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717]; *Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 159-160 [41 Cal.Rptr. 577, 397 P.2d 161]; see 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 514 and cases cited.) Within the broad range of reasonable practice and treatment in which professional opinion and judgment may differ, the therapist is free to exercise his or her own best judgment without liability; proof, aided by hindsight, that he or she judged wrongly is insufficient to establish negligence.

In the instant case, however, the pleadings do not raise any question as to failure of defendant therapists to predict that Poddar presented a serious danger of violence. On the contrary, the present complaints allege that defendant therapists did in fact predict that Poddar would kill, but were negligent in failing to warn.

---

[10]See, e.g., *People* v. *Burnick* (1975) 14 Cal.3d 306, 325-328 [121 Cal.Rptr. 488, 535 P.2d 352]; Monahan, *The Prevention of Violence*, in Community Mental Health in the Criminal Justice System (Monahan ed. 1975); Diamond, *The Psychiatric Prediction of Dangerousness* (1975) 123 U.Pa.L.Rev. 439; Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom* (1974) 62 Cal.L.Rev. 693.

Amicus contends, however, that even when a therapist does in fact predict that a patient poses a serious danger of violence to others, the therapist should be absolved of any responsibility for failing to act to protect the potential victim. In our view, however, once a therapist does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger. While the discharge of this duty of due care will necessarily vary with the facts of each case,[11] in each instance the adequacy of the therapist's conduct must be measured against the traditional negligence standard of the rendition of reasonable care under the circumstances. (Accord *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 243 [104 Cal.Rptr. 505, 502 P.2d 1].) As explained in Fleming and Maximov, *The Patient or His Victim: The Therapist's Dilemma* (1974) 62 Cal.L.Rev. 1025, 1067: ". . . the ultimate question of resolving the tension between the conflicting interests of patient and potential victim is one of social policy, not professional expertise. . . . In sum, the therapist owes a legal duty not only to his patient, but also to his patient's would-be victim and is subject in both respects to scrutiny by judge and jury."

Contrary to the assertion of amicus, this conclusion is not inconsistent with our recent decision in *People* v. *Burnick, supra,* 14 Cal.3d 306. Taking note of the uncertain character of therapeutic prediction, we held in *Burnick* that a person cannot be committed as a mentally disordered sex offender unless found to be such by proof beyond a reasonable doubt. (14 Cal.3d at p. 328.) The issue in the present context, however, is not whether the patient should be incarcerated, but whether the therapist should take any steps at all to protect the threatened victim; some of the alternatives open to the therapist, such as warning the victim, will not result in the drastic consequences of depriving the patient of his liberty. Weighing the uncertain and conjectural character of the alleged damage done the patient by such a warning against the peril to the victim's life, we conclude that professional inaccuracy in predicting violence cannot negate the therapist's duty to protect the threatened victim.

---

[11]Defendant therapists and amicus also argue that warnings must be given only in those cases in which the therapist knows the identity of the victim. We recognize that in some cases it would be unreasonable to require the therapist to interrogate his patient to discover the victim's identity, or to conduct an independent investigation. But there may also be cases in which a moment's reflection will reveal the victim's identity. The matter thus is one which depends upon the circumstances of each case, and should not be governed by any hard and fast rule.

The risk that unnecessary warnings may be given is a reasonable price to pay for the lives of possible victims that may be saved. We would hesitate to hold that the therapist who is aware that his patient expects to attempt to assassinate the President of the United States would not be obligated to warn the authorities because the therapist cannot predict with accuracy that his patient will commit the crime.

Defendants further argue that free and open communication is essential to psychotherapy (see *In re Lifschutz* (1970) 2 Cal.3d 415, 431-434 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1]); that "Unless a patient . . . is assured that . . . information [revealed by him] can and will be held in utmost confidence, he will be reluctant to make the full disclosure upon which·diagnosis and treatment . . . depends." (Sen. Com. on Judiciary, comment on Evid. Code, § 1014.) The giving of a warning, defendants contend, constitutes a breach of trust which entails the revelation of confidential communications.[12]

We recognize the public interest in supporting effective treatment of mental illness and in protecting the rights of patients to privacy (see *In re Lifschutz, supra*, 2 Cal.3d at p. 432), and the consequent public importance of safeguarding the confidential character of psychotherapeutic communication. Against this interest, however, we must weigh the public interest in safety from violent assault. The Legislature has undertaken the difficult task of balancing the countervailing concerns. In Evidence Code section 1014, it established a broad rule of privilege to protect confidential communications between patient and psychothera-

[12]Counsel for defendant Regents and amicus American Psychiatric Association predict that a decision of this court holding that a therapist may bear a duty to warn a potential victim will deter violence-prone persons from seeking therapy, and hamper the treatment of other patients. This contention was examined in Fleming and Maximov, *The Patient or His Victim: The Therapist's Dilemma* (1974) 62 Cal.L.Rev. 1025, 1038-1044; they conclude that such predictions are entirely speculative. In *In re Lifschutz, supra*, 2 Cal.3d 415, counsel for the psychiatrist argued that if the state could compel disclosure of some psychotherapeutic communications, psychotherapy could no longer be practiced successfully. (2 Cal.3d at p. 426.) We rejected that argument, and it does not appear that our decision in fact adversely affected the practice of psychotherapy in California. Counsels' forecast of harm in the present case. strikes us as equally dubious.

We note, moreover, that Evidence Code section 1024, enacted in 1965, established that psychotherapeutic communication is not privileged when disclosure is necessary to prevent threatened danger. We cannot accept without question counsels' implicit assumption that effective therapy for potentially violent patients depends upon either the patient's lack of awareness that a therapist can disclose confidential communications to avert impending danger, or upon the therapist's advance promise never to reveal nonprivileged threats of violence.

pist. In Evidence Code section 1024, the Legislature created a specific and limited exception to the psychotherapist-patient privilege: "There is no privilege . . . if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger."[13]

We realize that the open and confidential character of psychotherapeutic dialogue encourages patients to express threats of violence, few of which are ever executed. Certainly a therapist should not be encouraged routinely to reveal such threats; such disclosures could seriously disrupt the patient's relationship with his therapist and with the persons threatened. To the contrary, the therapist's obligations to his patient require that he not disclose a confidence unless such disclosure is necessary to avert danger to others, and even then that he do so discreetly, and in a fashion that would preserve the privacy of his patient to the fullest extent compatible with the prevention of the threatened danger. (See Fleming & Maximov, *The Patient or His Victim: The Therapist's Dilemma* (1974) 62 Cal.L.Rev. 1025, 1065-1066.)[14]

The revelation of a communication under the above circumstances is not a breach of trust or a violation of professional ethics; as stated in the Principles of Medical Ethics of the American Medical Association (1957), section 9: "A physician may not reveal the confidence entrusted to him in the course of medical attendance . . . *unless he is required to do so by law or unless it becomes necessary in order to protect the welfare of*

[13]Fleming and Maximov note that "While [section 1024] supports the therapist's less controversial *right* to make a disclosure, it admittedly does not impose on him a *duty* to do so. But the argument does not have to be pressed that far. For if it is once conceded . . . that a duty in favor of the patient's foreseeable victims would accord with general principles of tort liability, we need no longer look to the statute for a source of duty. It is sufficient if the statute can be relied upon . . . for the purpose of countering the claim that the needs of confidentiality are paramount and must therefore defeat any such hypothetical duty. In this more modest perspective, the Evidence Code's 'dangerous patient' exception may be invoked with some confidence as a clear expression of legislative policy concerning the balance between the confidentiality values of the patient and the safety values of his foreseeable victims." (Italics in original.) Fleming & Maximov, *The Patient or His Victim: The Therapist's Dilemma* (1974) 62 Cal.L.Rev. 1025, 1063.

[14]Amicus suggests that a therapist who concludes that his patient is dangerous should not warn the potential victim, but institute proceedings for involuntary detention of the patient. The giving of a warning, however, would in many cases represent a far lesser inroad upon the patient's privacy than would involuntary commitment.

*the individual or of the community.*"[15] (Italics added.) We conclude that the public policy favoring protection of the confidential character of patient-psychotherapist communications must yield to the extent to which disclosure is essential to avert danger to others. The protective privilege ends where the public peril begins.

Our current crowded and computerized society compels the interdependence of its members. In this risk-infested society we can hardly tolerate the further exposure to danger that would result from a concealed knowledge of the therapist that his patient was lethal. If the exercise of reasonable care to protect the threatened victim requires the therapist to warn the endangered party or those who can reasonably be expected to notify him, we see no sufficient societal interest that would protect and justify concealment. The containment of such risks lies in the public interest. For the foregoing reasons, we find that plaintiffs' complaints can be amended to state a cause of action against defendants Moore, Powelson, Gold, and Yandell and against the Regents as their employer, for breach of a duty to exercise reasonable care to protect Tatiana.[16]

Finally, we reject the contention of the dissent that the provisions of the Lanterman-Petris-Short Act which govern the release of confidential information (Welf. & Inst. Code, §§ 5328-5328.9) prevented defendant therapists from warning Tatiana. The dissent's contention rests on the assertion that Dr. Moore's letter to the campus police constituted an "application in writing" within the meaning of Welfare and Institutions Code section 5150, and thus initiates proceedings under the Lanterman-Petris-Short Act. A closer look at the terms of section 5150, however, will demonstrate that it is inapplicable to the present case.

Section 5150 refers to a written application only by a professional person who is "a member of the attending staff . . . of an evaluation

---

[15]See also Summary Report of the Task Force on Confidentiality of the Council on Professions and Associations of the American Psychiatric Association (1975).

[16]Moore argues that after Powelson countermanded the decision to seek commitment for Poddar, Moore was obliged to obey the decision of his superior and that therefore he should not be held liable for any dereliction arising from his obedience to superior orders. Plaintiffs in response contend that Moore's duty to members of the public endangered by Poddar should take precedence over his duty to obey Powelson. Since plaintiffs' complaints do not set out the date of Powelson's order, the specific terms of that order, or Powelson's authority to overrule Moore's decisions respecting patients under Moore's care, we need not adjudicate this conflict; we pass only upon the pleadings at this stage and decide if the complaints can be amended to state a cause of action.

facility designated by the county," or who is himself "designated by the county" as one authorized to take a person into custody and place him in a facility designated by the county and approved by the State Department of Mental Hygiene. The complaint fails specifically to allege that Dr. Moore was so empowered. Dr. Moore and the Regents cannot rely upon any inference to the contrary that might be drawn from plaintiff's allegation that Dr. Moore intended to "assign" a "detention" on Poddar; both Dr. Moore and the Regents have expressly conceded that neither Cowell Memorial Hospital nor any member of its staff has ever been designated by the County of Alameda to institute involuntary commitment proceedings pursuant to section 5150.

Furthermore, the provisions of the Lanterman-Petris-Short Act defining a therapist's duty to withhold confidential information are expressly limited to "information and records *obtained in the course of providing services* under Division 5 (commencing with section 5000), Division 6 (commencing with section 6000), or Division 7 (commencing with section 7000)" of the Welfare and Institutions Code (Welf. & Inst. Code, § 5328). (Italics added.) Divisions 5, 6 and 7 describe a variety of programs for treatment of the mentally ill or retarded.[17] The pleadings at issue on this appeal, however, state no facts showing that the psychotherapy provided to Poddar by the Cowell Memorial Hospital falls under any of these programs. We therefore conclude that the Lanterman-Petris-Short Act does not govern the release of information acquired by Moore during the course of rendition of those services.

Neither can we adopt the dissent's suggestion that we import wholesale the detailed provisions of the Lanterman-Petris-Short Act regulating the disclosure of confidential information and apply them to disclosure of information *not governed by the act.* Since the Legislature did not extend the act to control all disclosures of confidential matter by a therapist, we must infer that the Legislature did not relieve the courts of their obligation to define by reference to the principles of the common law the obligation of the therapist in those situations not governed by the act.

---

[17]Division 5 includes the Lanterman-Petris-Short Act and the Short-Doyle Act (community mental health services). Division 6 relates to programs for treatment of persons judicially committed as mentally disordered sex offenders or mentally retarded. Division 7 encompasses treatment at state and county mental hospitals, the Langley Porter Neuropsychiatric Institute and the Neuropsychiatric Institute of the U.C.L.A. Medical Center.

■ Turning now to the police defendants, we conclude that they do not have any such special relationship to either Tatiana or to Poddar sufficient to impose upon such defendants a duty to warn respecting Poddar's violent intentions. (See *Hartzler* v. *City of San Jose* (1975) 46 Cal.App.3d 6, 9-10 [120 Cal.Rptr. 5]; *Antique Arts Corp.* v. *City of Torrance* (1974) 39 Cal.App.3d 588, 593 [114 Cal.Rptr. 332].) Plaintiffs suggest no theory,[18] and plead no facts that give rise to any duty to warn on the part of the police defendants absent such a special relationship. They have thus failed to demonstrate that the trial court erred in denying leave to amend as to the police defendants. (See *Cooper* v. *Leslie Salt Co.* (1969) 70 Cal.2d 627, 636 [75 Cal.Rptr. 766, 451 P.2d 406]; *Filice* v. *Boccardo* (1962) 210 Cal.App.2d 843, 847 [26 Cal.Rptr. 789].)

3. ■ *Defendant therapists are not immune from liability for failure to warn.*

We address the issue of whether defendant therapists are protected by governmental immunity for having failed to warn Tatiana or those who reasonably could have been expected to notify her of her peril. We postulate our analysis on section 820.2 of the Government Code.[19] That provision declares, with exceptions not applicable here, that "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion [was] abused."[20]

---

[18]We have considered *sua sponte* whether plaintiffs' complaints could be amended to assert a cause of action against the police defendants under the principles of Restatement Second of Torts (1965) section 321, which provides that "If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect." (See *Hartzler* y. *City of San Jose, supra,* 46 Cal.App.3d 6, 10.) The record, however, suggests no facts which, if inserted into the complaints, might form the foundation for such cause of action. The assertion of a cause of action against the police defendants under this theory would raise difficult problems of causation and of public policy, which should not be resolved on the basis of conjectural facts not averred in the pleadings or in any proposed amendment to those pleadings.

[19]No more specific immunity provision of the Government Code appears to address the issue.

[20]Section 815.2 of the Government Code declares that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." The section further provides, with exceptions not applicable here, that "a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." The Regents, therefore, are immune from liability only if all individual defendants are similarly immune.

Noting that virtually every public act admits of some element of discretion, we drew the line in *Johnson* v. *State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352], between discretionary policy decisions which enjoy statutory immunity and ministerial administrative acts which do not. We concluded that section 820.2 affords immunity only for "*basic* policy decisions." (Italics added.) (See also *Elton* v. *County of Orange* (1970) 3 Cal.App.3d 1053, 1057-1058 [84 Cal.Rptr. 27]; 4 Cal. Law Revision Com. Rep. (1963) p. 810; Van Alstyne, Supplement to Cal. Government Tort Liability (Cont. Ed. Bar 1969) § 5.54, pp. 16-17; Comment, *California Tort Claims Act: Discretionary Immunity* (1966) 39 So.Cal.L.Rev. 470, 471; cf. James, *Tort Liability of Governmental Units and Their Officers* (1955) 22 U.Chi.L.Rev. 610, 637-638, 640, 642, 651.)

We also observed that if courts did not respect this statutory immunity, they would find themselves "in the unseemly position of determining the propriety of decisions expressly entrusted to a coordinate branch of government." (*Johnson* v. *State of California, supra,* at p. 793.) It therefore is necessary, we concluded, to "isolate those areas of quasi-legislative policy-making which are sufficiently sensitive to justify a blanket rule that courts will not entertain a tort action alleging that careless conduct contributed to the governmental decision." (*Johnson* v. *State of California, supra,* at p. 794.) After careful analysis we rejected, in *Johnson,* other rationales commonly advanced to support governmental immunity[21] and concluded that the immunity's scope should be no greater than is required to give legislative and executive policymakers sufficient breathing space in which to perform their vital policymaking functions.

Relying on *Johnson,* we conclude that defendant therapists in the present case are not immune from liability for their failure to warn of Tatiana's peril. *Johnson* held that a parole officer's determination whether to warn an adult couple that their prospective foster child had a background of violence "present[ed] no . . . reasons for immunity" (*Johnson* v. *State of California, supra,* at p. 795), was "at the lowest,

---

[21]We dismissed, in *Johnson,* the view that immunity continues to be necessary in order to insure that public employees will be sufficiently zealous in the performance of their official duties. The California Tort Claims Act of 1963 provides for indemnification of public employees against liability, absent bad faith, and also permits such employees to insist that their defenses be conducted at public expense. (See Gov. Code, §§ 825-825.6, 995-995.2.) Public employees thus no longer have a significant reason to fear liability as they go about their official tasks. We also, in *Johnson,* rejected the argument that a public employee's concern over the potential liability of his or her employer serves as a basis for immunity. (*Johnson* v. *State of California, supra,* at pp. 790-793.)

ministerial rung of official action" (*id.,* at p. 796), and indeed constituted "a classic case for the imposition of tort liability." (*Id.,* p. 797; cf. *Morgan v. County of Yuba, supra,* 230 Cal.App.2d 938, 942-943.) Although defendants in *Johnson* argued that the decision whether to inform the foster parents of the child's background required the exercise of considerable judgmental skills, we concluded that the state was not immune from liability for the parole officer's failure to warn because such a decision did not rise to the level of a "basic policy decision."

We also noted in *Johnson* that federal courts have consistently categorized failures to warn of latent dangers as falling outside the scope of discretionary omissions immunized by the Federal Tort Claims Act.[22] (See *United Air Lines, Inc.* v. *Wiener* (9th Cir. 1964) 335 F.2d 379, 397-398, cert. den. *sub nom. United Air Lines, Inc.* v. *United States,* 379 U.S. 951 [13 L.Ed.2d 549, 85 S.Ct. 452] (decision to conduct military training flights was discretionary but failure to warn commercial airline was not); *United States* v. *State of Washington* (9th Cir. 1965) 351 F.2d 913, 916 (decision where to place transmission lines spanning canyon was assumed to be discretionary but failure to warn pilot was not); *United States* v. *White* (9th Cir. 1954) 211 F.2d 79, 82 (decision not to "dedud" army firing range assumed to be discretionary but failure to warn person about to go onto range of unsafe condition was not); *Bulloch* v. *United States* (D.Utah 1955) 133 F.Supp. 885, 888 (decision how and when to conduct nuclear test deemed discretionary but failure to afford proper notice was not); *Hernandez* v. *United States* (D.Hawaii 1953) 112 F.Supp. 369, 371 (decision to erect road block characterized as discretionary but failure to warn of resultant hazard was not).

We conclude, therefore, that the therapist defendants' failure to warn Tatiana or those who reasonably could have been expected to notify her of her peril does not fall within the absolute protection afforded by section 820.2 of the Government Code. We emphasize that our conclu-

---

[22]By analogy, section 830.8 of the Government Code furnishes additional support for our conclusion that a failure to warn does not fall within the zone of immunity created by section 820.2. Section 830.8 provides: "Neither a public entity nor a public employee is liable . . . for an injury caused by the failure to provide traffic or warning signals, signs, markings or devices described in the Vehicle Code. Nothing in this section exonerates a public entity or public employee from liability for injury proximately caused by such failure if a signal, sign, marking or device . . . was necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care." The Legislature thus concluded at least in another context that the failure to warn of a latent danger is not an immunized discretionary omission. (See *Hilts* v. *County of Solano* (1968) 265 Cal.App.2d 161, 174 [71 Cal.Rptr. 275].)

sion does not raise the specter of therapists employed by the government indiscriminately being held liable for damage despite their exercise of sound professional judgment. We require of publicly employed therapists only that quantum of care which the common law requires of private therapists. The imposition of liability in those rare cases in which a public employee falls short of this standard does not contravene the language or purpose of Government Code section 820.2.

4. *Defendant therapists are immune from liability for failing to confine Poddar.*

We sustain defendant therapists' contention that Government Code section 856 insulates them from liability under plaintiffs' first and fourth causes of action for failing to confine Poddar. Section 856 affords public entities and their employees absolute protection from liability for "any injury resulting from determining in accordance with any applicable enactment . . . whether to confine a person for mental illness." Since this section refers to a determination to confine "in accordance with any applicable enactment," plaintiffs suggest that the immunity is limited to persons designated under Welfare and Institutions Code section 5150 as authorized finally to adjudicate a patient's confinement. Defendant therapists, plaintiffs point out, are not among the persons designated under section 5150.

The language and legislative history of section 856, however, suggest a far broader immunity. In 1963, when section 856 was enacted, the Legislature had not established the statutory structure of the Lanterman-Petris-Short Act. Former Welfare and Institutions Code section 5050.3 (renumbered as Welf. & Inst. Code, § 5880; repealed July 1, 1969) which resembled present section 5150, authorized emergency detention at the behest only of peace officers, health officers, county physicians, or assistant county physicians; former section 5047 (renumbered as Welf. & Inst. Code, § 5551; repealed July 1, 1969), however, authorized a petition seeking commitment by any person, including the "physician attending the patient." The Legislature did not refer in section 856 only to those persons authorized to institute emergency proceedings under section 5050.3; it broadly extended immunity to all employees who acted in accord with "any applicable enactment," thus granting immunity not only to persons who are empowered to confine, but also to those authorized to request or recommend confinement.

The Lanterman-Petris-Short Act, in its extensive revision of the procedures for commitment of the mentally ill, eliminated any specific statutory reference to petitions by treating physicians, but it did not limit the authority of a therapist in government employ to request, recommend or initiate actions which may lead to commitment of his patient under the act. We believe that the language of section 856, which refers to any action in the course of employment and in accordance with any applicable enactment, protects the therapist who must undertake this delicate and difficult task. (See Fleming & Maximov, *The Patient or His Victim: The Therapist's Dilemma* (1974) 62 Cal.L.Rev. 1025, 1064.) Thus the scope of the immunity extends not only to the final determination to confine or not to confine the person for mental illness, but to all determinations involved in the process of commitment. (Cf. *Hernandez* v. *State of California* (1970) 11 Cal.App.3d 895, 899-900 [90 Cal.Rptr. 205].)

Turning first to Dr. Powelson's status with respect to section 856, we observe that the actions attributed to him by plaintiffs' complaints fall squarely within the protections furnished by that provision. Plaintiffs allege Powelson ordered that no actions leading to Poddar's detention be taken. This conduct reflected Powelson's determination not to seek Poddar's confinement and thus falls within the statutory immunity.

Section 856 also insulates Dr. Moore for his conduct respecting confinement, although the analysis in his case is a bit more subtle. Clearly, Moore's decision that Poddar *be* confined was not a proximate cause of Tatiana's death, for indeed if Moore's efforts to bring about Poddar's confinement had been successful, Tatiana might still be alive today. Rather, any confinement claim against Moore must rest upon Moore's failure to overcome Powelson's decision and actions opposing confinement.

Such a claim, based as it necessarily would be, upon a subordinate's failure to prevail over his superior, obviously would derive from a rather onerous duty. Whether to impose such a duty we need not decide, however, since we can confine our analysis to the question whether Moore's failure to overcome Powelson's decision realistically falls within the protection afforded by section 856. Based upon the allegations before us, we conclude that Moore's conduct is protected.

Plaintiffs' complaints imply that Moore acquiesced in Powelson's countermand of Moore's confinement recommendation. Such acquies-

cence is functionally equivalent to determining not to seek Poddar's confinement and thus merits protection under section 856. At this stage we are unaware, of course, precisely how Moore responded to Powelson's actions; he may have debated the confinement issue with Powelson, for example, or taken no initiative whatsoever, perhaps because he respected Powelson's judgment, feared for his future at the hospital, or simply recognized that the proverbial handwriting was on the wall. None of these possibilities constitutes, however, the type of careless or wrongful behavior subsequent to a decision respecting confinement which is stripped of protection by the exception in section 856.[23] Rather, each is in the nature of a decision not to continue to press for Poddar's confinement. No language in plaintiffs' original or amended complaints suggests that Moore determined to fight Powelson, but failed successfully to do so, due to negligent or otherwise wrongful acts or omissions. Under the circumstances, we conclude that plaintiffs' second amended complaints allege facts which trigger immunity for Dr. Moore under section 856.[24]

5. ■ *Defendant police officers are immune from liability for failing to confine Poddar in their custody.*

Confronting, finally, the question whether the defendant police officers are immune from liability for releasing Poddar after his brief confinement, we conclude that they are. The source of their immunity is section 5154 of the Welfare and Institutions Code, which declares that: "[t]he professional person in charge of the facility providing 72-hour treatment and evaluation, his designee, *and the peace officer responsible for the detainment of the person* shall not be held civilly or criminally liable for any action by a person released at or before the end of 72 hours . . . ." (Italics added.)

Although defendant police officers technically were not "peace officers" as contemplated by the Welfare and Institutions Code,[25]

[23]Section 856 includes the exception to the general rule of immunity "for injury proximately caused by . . . negligent or wrongful acts or omission in carrying out or failing to carry out . . . a determination to confine or not to confine a person for mental illness . . . ."

[24]Because Dr. Gold and Dr. Yandell were Dr. Powelson's subordinates, the analysis respecting whether they are immune for having failed to obtain Poddar's confinement is similar to the analysis applicable to Dr. Moore.

[25]Welfare and Institutions Code section 5008, subdivision (i), defines "peace officer" for purposes of the Lanterman-Petris-Short Act as a person specified in sections 830.1 and 830.2 of the Penal Code. Campus police do not fall within the coverage of section 830.1 and were not included in section 830.2 until 1971.

plaintiffs' assertion that the officers incurred liability by failing to continue Poddar's confinement clearly contemplates that the officers were "responsible for the detainment of [Poddar]." We could not impose a duty upon the officers to keep Poddar confined yet deny them the protection furnished by a statute immunizing those "responsible for . . . [confinement]." Because plaintiffs would have us treat defendant officers as persons who were capable of performing the functions of the "peace officers" contemplated by the Welfare and Institutions Code, we must accord defendant officers the protections which that code prescribed for such "peace officers."

### 6. *Plaintiffs' complaints state no cause of action for exemplary damages.*

Plaintiff's third cause of action seeks punitive damages against defendant Powelson. The California statutes and decisions, however, have been interpreted to bar the recovery of punitive damages in a wrongful death action. (See *Pease* v. *Beech Aircraft Corp.* (1974) 38 Cal.App.3d 450, 460-462 [113 Cal.Rptr. 416] and authorities there cited.)

### 7. *Conclusion*

For the reasons stated, we conclude that plaintiffs can amend their complaints to state a cause of action against defendant therapists by asserting that the therapists in fact determined that Poddar presented a serious danger of violence to Tatiana, or pursuant to the standards of their profession should have so determined, but nevertheless failed to exercise reasonable care to protect her from that danger. To the extent, however, that plaintiffs base their claim that defendant therapists breached that duty because they failed to procure Poddar's confinement, the therapists find immunity in Government Code section 856. Further, as to the police defendants we conclude that plaintiffs have failed to show that the trial court erred in sustaining their demurrer without leave to amend.

The judgment of the superior court in favor of defendants Atkinson, Beall, Brownrigg, Hallernan, and Teel is affirmed. The judgment of the superior court in favor of defendants Gold, Moore, Powelson, Yandell, and the Regents of the University of California is reversed, and the cause remanded for further proceedings consistent with the views expressed herein.

Wright, C. J., Sullivan, J., and Richardson, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the result in this instance only because the complaints allege that defendant therapists did in fact predict that Poddar would kill and were therefore negligent in failing to warn of that danger. Thus the issue here is very narrow: we are not concerned with whether the therapists, pursuant to the standards of their profession, "should have" predicted potential violence; they allegedly did so in actuality. Under these limited circumstances I agree that a cause of action can be stated.

Whether plaintiffs can ultimately prevail is problematical at best. As the complaints admit, the therapists *did* notify the police that Poddar was planning to kill a girl identifiable as Tatiana. While I doubt that more should be required, this issue may be raised in defense and its determination is a question of fact.

I cannot concur, however, in the majority's rule that a therapist may be held liable for failing to predict his patient's tendency to violence if other practitioners, pursuant to the "standards of the profession," would have done so. The question is, what standards? Defendants and a responsible amicus curiae, supported by an impressive body of literature discussed at length in our recent opinion in *People* v. *Burnick* (1975) 14 Cal.3d 306 [121 Cal.Rptr. 488, 535 P.2d 352], demonstrate that psychiatric predictions of violence are inherently unreliable.

In *Burnick,* at pages 325-326, we observed: "In the light of recent studies it is no longer heresy to question the reliability of psychiatric predictions. Psychiatrists themselves would be the first to admit that however desirable an infallible crystal ball might be, it is not among the tools of their profession. It must be conceded that psychiatrists still experience considerable difficulty in confidently and accurately *diagnosing* mental illness. Yet those difficulties are multiplied manyfold when psychiatrists venture from diagnosis to prognosis and undertake to predict the consequences of such illness: ' "A diagnosis of mental illness tells us nothing about whether the person so diagnosed is or is not dangerous. Some mental patients are dangerous, some are not. Perhaps the psychiatrist is an expert at deciding whether a person is mentally ill, but is he an expert at predicting which of the persons so diagnosed are dangerous? Sane people, too, are dangerous, and it may legitimately be inquired whether there is anything in the education, training or experience of psychiatrists which renders them particularly adept at predicting dangerous behavior. Predictions of dangerous behavior, no

matter who makes them, are incredibly inaccurate, and there is a growing consensus that psychiatrists are not uniquely qualified to predict dangerous behavior and are, in fact, less accurate in their predictions than other professionals." ' (*Murel* v. *Baltimore City Criminal Court* (1972) . . . 407 U.S. 355, 364-365, fn. 2 [32 L.Ed.2d 791, 796-797, 92 S.Ct. 2091] (Douglas, J., dissenting from dismissal of certiorari).)" (Fns. omitted.) (See also authorities cited at p. 327 & fn. 18 of 14 Cal.3d.)

The majority confidently claim their opinion is not offensive to *Burnick,* on the stated ground that *Burnick* involved proceedings to commit an alleged mentally disordered sex offender and this case does not. I am not so sanguine about the distinction. Obviously the two cases are not factually identical, but the similarity in issues is striking: in *Burnick* we were likewise called upon to appraise the ability of psychiatrists to predict dangerousness, and while we declined to bar all such testimony (*id.,* at pp. 327-328) we found it so inherently untrustworthy that we would permit confinement even in a so-called civil proceeding only upon proof beyond a reasonable doubt.

I would restructure the rule designed by the majority to eliminate all reference to conformity to standards of the profession in predicting violence. If a psychiatrist does in fact predict violence, then a duty to warn arises. The majority's expansion of that rule will take us from the world of reality into the wonderland of clairvoyance.

**CLARK, J.**—Until today's majority opinion, both legal and medical authorities have agreed that confidentiality is essential to effectively treat the mentally ill, and that imposing a duty on doctors to disclose patient threats to potential victims would greatly impair treatment. Further, recognizing that effective treatment and society's safety are necessarily intertwined, the Legislature has already decided effective and confidential treatment is preferred over imposition of a duty to warn.

The issue whether effective treatment for the mentally ill should be sacrificed to a system of warnings is, in my opinion, properly one for the Legislature, and we are bound by its judgment. Moreover, even in the absence of clear legislative direction, we must reach the same conclusion because imposing the majority's new duty is certain to result in a net increase in violence.

The majority rejects the balance achieved by the Legislature's Lanterman-Petris-Short Act. (Welf. & Inst. Code, § 5000 et seq.,

hereafter the act.)[1] In addition, the majority fails to recognize that, even absent the act, overwhelming policy considerations mandate against sacrificing fundamental patient interests without gaining a corresponding increase in public benefit.

STATUTORY PROVISIONS

Although the parties have touched only briefly on the nondisclosure provisions of the act, amici have pointed out their importance. The instant case arising after ruling on demurrer, the parties must confront the act's provisions in the trial court. In these circumstances the parties' failure to fully meet the provisions of the act would not justify this court's refusal to discuss and apply the law.

Having a grave impact on future treatment of the mentally ill in our state, the majority opinion clearly transcends the interests of the immediate parties and must discuss all applicable law. It abdicates judicial responsibility to refuse to recognize the clear legislative policy reflected in the act.

Effective 1 July 1969, the Legislature created a comprehensive statutory resolution of the rights and duties of both the mentally infirm and those charged with their care and treatment. The act's purposes include ending inappropriate commitment, providing prompt care, protecting public safety, and safeguarding personal rights. (§ 5001.) The act applies to both voluntary and involuntary commitment and to both public and private institutions; it details legal procedure for commitment; it enumerates the legal and civil rights of persons committed; and it spells out the duties, liabilities and rights of the psychotherapist. Thus the act clearly evinces the Legislature's weighing of the countervailing concerns presently before us—when a patient has threatened a third person during psychiatric treatment.

Reflecting legislative recognition that disclosing confidences impairs effective treatment of the mentally ill, and thus is contrary to the best interests of society, the act establishes the therapist's duty to *not* disclose. Section 5328 provides in part that "[a]ll information and records obtained in the course of providing services . . . to either voluntary or involuntary recipients of services *shall* be confidential." (Italics added.) Further, a patient may enjoin disclosure in violation of statute and, may

---

[1]All statutory references, unless otherwise stated, are to the Welfare and Institutions Code.

recover the greater of $500 or three times the amount of actual damage for unlawful disclosure. (§ 5330.)

However, recognizing that some private and public interests must override the patient's, the Legislature established several limited exceptions to confidentiality.[2] The limited nature of these exceptions and the

[2]Section 5328 provides: "All information and records obtained in the course of providing services under Division 5 (commencing with Section 5000), Division 6 (commencing with Section 6000), or Division 7 (commencing with Section 7000), to either voluntary or involuntary recipients of services shall be confidential. Information and records may be disclosed only: [¶] (a) In communications between qualified professional persons in the provision of services or appropriate referrals, or in the course of conservatorship proceedings. The consent of the patient, or his guardian or conservator must be obtained before information or records may be disclosed by a professional person employed by a facility to a professional person not employed by the facility who does not have the medical responsibility for the patient's care. [¶] (b) When the patient, with the approval of the physician in charge of the patient, designates persons to whom information or records may be released, except that nothing in this article shall be construed to compel a physician, psychologist, social worker, nurse, attorney, or other professional person to reveal information which has been given to him in confidence by members of a patient's family; [¶] (c) To the extent necessary for a recipient to make a claim, or for a claim to be made on behalf of a recipient for aid, insurance, or medical assistance to which he may be entitled; [¶] (d) If the recipient of services is a minor, ward, or conservatee, and his parent, guardian, or conservator designates, in writing, persons to whom records or information may be disclosed, except that nothing in this article shall be construed to compel a physician, psychologist, social worker, nurse, attorney, or other professional person to reveal information which has been given to him in confidence by members of a patient's family; [¶] (e) For research, provided that the Director of Health designates by regulation, rules for the conduct of research. Such rules shall include, but need not be limited to, the requirement that all researchers must sign an oath of confidentiality as follows:

......................
Date

As a condition of doing research concerning persons who have received services from ........ (fill in the facility, agency or person), I, ........., agree not to divulge any information obtained in the course of such research to unauthorized persons, and not to publish or otherwise make public any information regarding persons who have received services such that the person who received services is identifiable.
I recognize that unauthorized release of confidential information may make me subject to a civil action under provisions of the Welfare and Institutions Code.

......................
Signed

[¶] (f) To the courts, as necessary to the administration of justice. [¶] (g) To governmental law enforcement agencies as needed for the protection of federal and state elective constitutional officers and their families. [¶] (h) To the Senate Rules Committee or the Assembly Rules Committee for the purposes of legislative investigation authorized by such committee. [¶] (i) If the recipient of services who applies for life or disability insurance designates in writing the insurer to which records or information may be disclosed. [¶] (j) To the attorney for the patient in any and all proceedings upon presentation of a release of information signed by the patient, except that when the patient is unable to sign such release, the staff of the facility, upon satisfying itself of the identity of said attorney, and of the fact that the attorney does represent the interests of

legislative concern that disclosure might impair treatment, thereby harming both patient and society, are shown by section 5328.1. The section provides that a therapist may disclose "to a member of the family of a patient the information that the patient is presently a patient in the facility or that the patient is seriously physically ill . . . if the professional person in charge of the facility determines that the release of such information is in the best interest of the patient." Thus, disclosing even the fact of treatment is severely limited.

As originally enacted the act contained no provision allowing the therapist to warn anyone of a patient's threat. In 1970, however, the act was amended to permit disclosure in two limited circumstances. Section 5328 was amended, in subdivision (g), to allow disclosure "[t]o *governmental law enforcement agencies* as needed for the protection of federal and state elective constitutional officers and their families." (Italics added.) In addition, section 5328.3 was added to provide that when "necessary for the protection of the patient or *others* due to the patient's disappearance from, without prior notice to, a designated facility and his whereabouts is unknown, notice of such disappearance *may* be made to *relatives and governmental law enforcement agencies* designated by the physician in charge of the patient or the professional person in charge of the facility or his designee." (Italics added.)

Obviously neither exception to the confidentiality requirement is applicable to the instant case.

Not only has the Legislature specifically dealt with disclosure and warning, but it also has dealt with therapist and police officer liability for acts of the patient. The Legislature has provided that the therapist and the officer shall not be liable for prematurely releasing the patient. (§§ 5151, 5154, 5173, 5278, 5305, 5306.)

---

the patient, may release all information and records relating to the patient except that nothing in this article shall be construed to compel a physician, psychologist, social worker, nurse, attorney, or other professional person to reveal information which has been given to him in confidence by members of a patient's family. [¶] The amendment of subdivision (d) of this section enacted at the 1970 Regular Session of the Legislature does not constitute a change in, but is declaratory of, the preexisting law."

Subdivisions (g), (h), and (i) were added by amendment in 1972. Subdivision (j) was added by amendment in 1974.

Section 5328, specifically enumerating exceptions to the confidentiality requirement, does not admit of an interpretation importing implied exceptions. (*County of Riverside* v. *Superior Court*, 42 Cal.App.3d 478, 481 [116 Cal.Rptr. 886].)

Ignoring the act's detailed provisions, the majority has chosen to focus on the "dangerous patient exception" to the psychotherapist-patient privilege in Evidence Code sections 1014, 1024 as indicating that "the Legislature has undertaken the difficult task of balancing the countervailing concerns." (*Ante,* p. 440.) However, this conclusion is erroneous. The majority fails to appreciate that when disclosure is permitted in an evidentiary hearing, a fourth interest comes into play—the court's concern in judicial supervision. Because they are necessary to the administration of justice, disclosures to the courts are excepted from the nondisclosure requirement by section 5328, subdivision (f). However, this case does not involve a court disclosure. Subdivision (f) and the Evidence Code sections relied on by the majority are clearly inapposite.

The provisions of the act are applicable here. Section 5328 (see fn. 2, *ante*) provides, *"All information and records obtained in the course of providing services under division 5 . . . shall be confidential."* (Italics added.) Dr. Moore's letter describing Poddar's mental condition for purposes of obtaining 72-hour commitment was undisputedly a transmittal of information designed to invoke application of division 5. As such it constituted information obtained in providing services under division 5. This is true regardless of whether Dr. Moore has been designated a professional person by the County of Alameda. Although section 5150 provides that commitment for 72 hours' evaluation shall be based on a statement by a peace officer or person designated by the county, section 5328 prohibits disclosure of *all information,* not just disclosure of the committing statement or disclosure by persons designated by the county. In addition, section 5330 gives the patient a cause of action for disclosure of confidential information by "an individual" rather than the persons enumerated in section 5150.

Moreover, it appears from the allegations of the complaint that Dr. Moore is in fact a person designated by the county under section 5150. The complaint alleges that "On or about August 20, 1969, defendant Dr. Moore notified Officers Atkinson and Teel, he would give the campus police a letter of diagnosis on Prosenjit Poddar, so the campus police could pick up Poddar and take him to Herrick Hospital in Berkeley where Dr. Moore would assign a 72-hour Emergency Psychiatric Detention on Prosenjit Poddar." Since there is no allegation that Dr. Moore was not authorized to sign the document, it must be concluded that under the allegations of the complaint he was authorized and thus a professional person designated by the county.

Whether we rely on the facts as stated in the complaint that Dr. Moore is a designated person under section 5150 or on the strict prohibitions of section 5328 prohibiting disclosure of *"all information,"* the imposition of a duty to warn by the majority flies directly in the face of the Lanterman-Petris-Short Act.

Under the act, there can be no liability for Poddar's premature release. It is likewise clear there exists no duty to warn. Under section 5328, the therapists were under a duty *to not disclose,* and no exception to that duty is applicable here. Establishing a duty to warn on the basis of general tort principles imposes a Draconian dilemma on therapists—either violate the act thereby incurring the attendant statutory penalties, or ignore the majority's duty to warn thereby incurring potential civil liability. I am unable to assent to such.

If the majority feels that it must impose such a dilemma, then it has an obligation to specifically enumerate the circumstances under which the Lanterman-Petris-Short Act applies as opposed to the circumstances when "general tort principles" will govern. The majority's failure to perform this obligation—leaving to the therapist the subtle questions as to when each opposing rule applies—is manifestly unfair.

DUTY TO DISCLOSE IN THE ABSENCE OF CONTROLLING
STATUTORY PROVISION

Even assuming the act's provisions are applicable only to conduct occurring after commitment, and not to prior conduct, the act remains applicable to the most dangerous patients—those committed. The Legislature having determined that the balance of several interests requires nondisclosure in the graver public danger commitment, it would be anomalous for this court to reweigh the interests, requiring disclosure for those less dangerous. Rather, we should follow the legislative direction by refusing to require disclosure of confidential information received by the therapist either before or in the absence of commitment. The Legislature obviously is more capable than is this court to investigate, debate and weigh potential patient harm through disclosure against the risk of public harm by nondisclosure. We should defer to its judgment.

COMMON LAW ANALYSIS

Entirely apart from the statutory provisions, the same result must be reached upon considering both general tort principles and the public

policies favoring effective treatment, reduction of violence, and justified commitment.

Generally, a person owes no duty to control the conduct of another. (*Richards* v. *Stanley* (1954) 43 Cal.2d 60, 65 [271 P.2d 23]; *Wright* v. *Arcade School Dist.* (1964) 230 Cal.App.2d 272, 277 [40 Cal.Rptr. 812]; Rest.2d Torts (1965) § 315.) Exceptions are recognized only in limited situations where (1) a special relationship exists between the defendant and injured party, or (2) a special relationship exists between defendant and the active wrongdoer, imposing a duty on defendant to control the wrongdoer's conduct. The majority does not contend the first exception is appropriate to this case.

Policy generally determines duty. (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].) Principal policy considerations include foreseeability of harm, certainty of the plaintiff's injury, proximity of the defendant's conduct to the plaintiff's injury, moral blame attributable to defendant's conduct, prevention of future harm, burden on the defendant, and consequences to the community. (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)

Overwhelming policy considerations weigh against imposing a duty on psychotherapists to warn a potential victim against harm. While offering virtually no benefit to society, such a duty will frustrate psychiatric treatment, invade fundamental patient rights and increase violence.

The importance of psychiatric treatment and its need for confidentiality have been recognized by this court. (*In re Lifschutz* (1970) 2 Cal.3d 415, 421-422 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1].) "It is clearly recognized that the very practice of psychiatry vitally depends upon the reputation in the community that the psychiatrist will not tell." (Slovenko, *Psychiatry and a Second Look at the Medical Privilege* (1960) 6 Wayne L.Rev. 175, 188.)

Assurance of confidentiality is important for three reasons.

DETERRENCE FROM TREATMENT

First, without substantial assurance of confidentiality, those requiring treatment will be deterred from seeking assistance. (See Sen. Judiciary Com. comment accompanying § 1014 of Evid. Code; Slovenko, *supra,* 6

Wayne L.Rev. 175, 187-188; Goldstein & Katz, *Psychiatrist-Patient Privilege: The GAP Proposal and the Connecticut Statute* (1962) 36 Conn.Bar J. 175, 178.) It remains an unfortunate fact in our society that people seeking psychiatric guidance tend to become stigmatized. Apprehension of such stigma—apparently increased by the propensity of people considering treatment to see themselves in the worst possible light—creates a well-recognized reluctance to seek aid. (Fisher, *The Psychotherapeutic Professions and the Law of Privileged Communications* (1964) 10 Wayne L.Rev. 609, 617; Slovenko, *supra,* 6 Wayne L.Rev. 175, 188; see also Rappeport, *Psychiatrist-Patient Privilege* (1963) 23 Md.L.J. 39, 46-47.) This reluctance is alleviated by the psychiatrist's assurance of confidentiality.

FULL DISCLOSURE

Second, the guarantee of confidentiality is essential in eliciting the full disclosure necessary for effective treatment. (*In re Lifschutz, supra,* 2 Cal.3d 415, 431; *Taylor* v. *United States* (D.C.Cir. 1955) 222 F.2d 398, 401 [95 App.D.C. 373]; Goldstein & Katz, *supra,* 36 Conn.Bar J. 175, 178; Heller, *Some Comments to Lawyers on the Practice of Psychiatry* (1957) 30 Temp.L.Q. 401; Guttmacher & Weihofen, *Privileged Communications Between Psychiatrist and Patient* (1952) 28 Ind.L.J.32, 34.)[3] The psychiatric patient approaches treatment with conscious and unconscious inhibitions against revealing his innermost thoughts. "Every person, however well-motivated, has to overcome resistances to therapeutic exploration. These resistances seek support from every possible source and the possibility of disclosure would easily be employed in the service of resistance." (Goldstein & Katz, *supra,* 36 Conn.Bar J. 175, 179; see also, 118 Am.J.Psych. 734, 735.) Until a patient can trust his psychiatrist not to violate their confidential relationship, "the unconscious psychological control mechanism of repression will prevent the recall of past experiences." (Butler, *Psychotherapy and Griswold: Is Confidentiality a Privilege or a Right?* (1971) 3 Conn.L.Rev. 599, 604.)

SUCCESSFUL TREATMENT

Third, even if the patient fully discloses his thoughts, assurance that the confidential relationship will not be breached is necessary to

---

[3]One survey indicated that five of every seven people interviewed said they would be less likely to make full disclosure to a psychiatrist in the absence of assurance of confidentiality. (See, Comment, *Functional Overlap Between the Lawyer and Other Professionals: Its Implications for the Privileged Communications Doctrine* (1962) 71 Yale L.J. 1226, 1255.)

maintain his trust in his psychiatrist—the very means by which treatment is effected. "[T]he essence of much psychotherapy is the contribution of trust in the external world and ultimately in the self, modelled upon the trusting relationship established during therapy." (Dawidoff, *The Malpractice of Psychiatrists,* 1966 Duke L.J. 696, 704.) Patients will be helped only if they can form a trusting relationship with the psychiatrist. (*Id.,* at p. 704, fn. 34; Burham, *Separation Anxiety* (1965) 13 Arch.Gen.Psych. 346, 356; Heller, *supra,* 30 Temp.L.Q. 401, 406.) All authorities appear to agree that if the trust relationship cannot be developed because of collusive communication between the psychiatrist and others, treatment will be frustrated. (See, e.g., Slovenko (1973) Psychiatry and Law, p. 61; Cross, *Privileged Communications Between Participants in Group Psychotherapy* (1970) Law & Soc. Order, 191, 199; Hollender, *The Psychiatrist and the Release of Patient Information* (1960) 116 Am.J.Psych. 828, 829.)

Given the importance of confidentiality to the practice of psychiatry, it becomes clear the duty to warn imposed by the majority will cripple the use and effectiveness of psychiatry. Many people, potentially violent—yet susceptible to treatment—will be deterred from seeking it; those seeking it will be inhibited from making revelations necessary to effective treatment; and, forcing the psychiatrist to violate the patient's trust will destroy the interpersonal relationship by which treatment is effected.

VIOLENCE AND CIVIL COMMITMENT

By imposing a duty to warn, the majority contributes to the danger to society of violence by the mentally ill and greatly increases the risk of civil commitment—the total deprivation of liberty—of those who should not be confined.[4] The impairment of treatment and risk of improper commitment resulting from the new duty to warn will not be limited to a few patients but will extend to a large number of the mentally ill.

---

[4]The burden placed by the majority on psychiatrists may also result in the improper deprivation of two other constitutionally protected rights. First, the patient's constitutional right of privacy (*In re Lifschutz, supra,* 2 Cal.3d 415) is obviously encroached upon by requiring the psychotherapist to disclose confidential communications. Secondly, because confidentiality is essential to effective treatment, the majority's decision also threatens the constitutionally recognized right to receive treatment. (*People* v. *Feagley* (1975) 14 Cal.3d 338, 359 [121 Cal.Rptr. 509, 535 P.2d 373]; *Wyatt* v. *Stickney* (M.D.Ala. 1971) 325 F.Supp. 781, 784, affd. *sub nom. Wyatt* v. *Aderholt* (5th Cir. 1974) 503 F.2d 1305; *Nason* v. *Superintendent of Bridgewater State Hosp.* (1968) 353 Mass. 604 [233 N.E.2d 908].)

Although under existing psychiatric procedures only a relatively few receiving treatment will ever present a risk of violence, the number making threats is huge, and it is the latter group—not just the former—whose treatment will be impaired and whose risk of commitment will be increased.

Both the legal and psychiatric communities recognize that the process of determining potential violence in a patient is far from exact, being fraught with complexity and uncertainty. (E.g., *People* v. *Burnick* (1975) 14 Cal.3d 306, 326 [121 Cal.Rptr. 488, 535 P.2d 352], quoting from *Murel* v. *Baltimore City Criminal Court* (1972) 407 U.S. 355, 364-365, fn. 2 [32 L.Ed.2d 791, 796-797, 92 S.Ct. 2091] (Douglas, J., dissenting from dismissal of certiorari); Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom,* 62 Cal.L.Rev. 693, 711-716; Rector, *Who Are the Dangerous?* (July 1973) Bull.Am.Acad. Psych. & L. 186; Kozol, Boucher & Garofalo, *The Diagnosis and Treatment of Dangerousness* (1972) 18 Crime & Delinq. 371; Justice & Birkman, *An Effort to Distinguish the Violent From the Nonviolent* (1972) 65 So.Med.J. 703.)[5] In fact, precision has not even been attained in predicting who of those having already committed violent acts will again become violent, a task recognized to be of much simpler proportions. (Kozol, Boucher & Garofalo, *supra,* 18 Crime & Delinq. 371, 384.)

This predictive uncertainty means that the number of disclosures will necessarily be large. As noted above, psychiatric patients are encouraged to discuss all thoughts of violence, and they often express such thoughts. However, unlike this court, the psychiatrist does not enjoy the benefit of

---

[5] A shocking illustration of psychotherapists' inability to predict dangerousness, cited by this court in *People* v. *Burnick, supra,* 14 Cal.3d 306, 326-327, footnote 17, is cited and discussed in Ennis, Prisoners of Psychiatry: Mental Patients, Psychiatrists, and the Law (1972): "In a well-known study, psychiatrists predicted that 989 persons were so dangerous that they could not be kept even in civil mental hospitals, but would have to be kept in maximum security hospitals run by the Department of Corrections. Then, because of a United States Supreme Court decision, those persons were transferred to civil hospitals. After a year, the Department of Mental Hygiene reported that one-fifth of them had been discharged to the community, and over half had agreed to remain as voluntary patients. During the year, only 7 of the 989 committed or threatened any act that was sufficiently dangerous to require retransfer to the maximum security hospital. Seven correct predictions out of almost a thousand is not a very impressive record. [¶] Other studies, and there are many, have reached the same conclusion: psychiatrists simply cannot predict dangerous behavior." (*Id.,* at p. 227.) Equally illustrative studies are collected in Rosenhan, *On Being Sane in Insane Places* (1973) 13 Santa Clara Law. 379, 384; Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, supra,* 62 Cal.L.Rev. 693, 750-751.)

overwhelming hindsight in seeing which few, if any, of his patients will ultimately become violent. Now, confronted by the majority's new duty, the psychiatrist must instantaneously calculate potential violence from each patient on each visit. The difficulties researchers have encountered in accurately predicting violence will be heightened for the practicing psychiatrist dealing for brief periods in his office with ·heretofore nonviolent patients. And, given the decision not to warn or commit must always be made at the psychiatrist's civil peril, one can expect most doubts will be resolved in favor of the psychiatrist protecting himself.

Neither alternative open to the psychiatrist seeking to protect himself is in the public interest. The warning itself is an impairment of the psychiatrist's ability to treat, depriving many patients of adequate treatment. It is to be expected that after disclosing their threats, a significant number of patients, who would not become violent if treated according to existing practices, will engage in violent conduct as a result of unsuccessful treatment. In short, the majority's duty to warn will not only impair treatment of many who would never become violent but worse, will result in a net increase in violence.[6]

---

[6]The majority concedes that psychotherapeutic dialogue often results in the patient expressing threats of violence that are rarely executed. (*Ante*, p. 441.) The practical problem, of course, lies in ascertaining which threats from which patients will be carried out. As to this problem, the majority is silent. They do, however, caution that a therapist certainly "should not be encouraged routinely to reveal such threats; such disclosures could seriously disrupt the patient's relationship with his therapist and with the persons threatened." (*Id.*)

Thus, in effect, the majority informs the therapists that they must accurately predict dangerousness—a task recognized as extremely difficult—or face crushing civil liability. The majority's reliance on the traditional standard of care for professionals that "therapist need only exercise 'that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of [that professional specialty] under similar circumstances'" (*ante*, p. 438) is seriously misplaced. This standard of care assumes that, to a large extent, the subject matter of the specialty is ascertainable. One clearly ascertainable element in the psychiatric field is that the ·therapist cannot accurately predict dangerousness, which, in turn, means that the standard is inappropriate for lack of a relevant criterion by which to judge the therapist's decision. The inappropriateness of the standard the majority would have us use is made patent when consideration is given to studies, by several eminent authorities, indicating that "[t]he chances of a second psychiatrist agreeing with the diagnosis of a first psychiatrist 'are barely better than 50-50; or stated differently, there is about as much chance that a different expert would come to some different conclusion as there is that the other would agree.'" (Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, supra,* 62 Cal.L.Rev. 693, 701, quoting, Ziskin, Coping With Psychiatric and Psychological Testimony, p. 126.) The majority's attempt to apply a normative scheme to a profession which must be concerned with problems that balk at standardization is clearly erroneous.

In any event, an ascertainable standard would not serve to limit psychiatrist disclosure of threats with the resulting impairment of treatment. However compassionate, the

The second alternative open to the psychiatrist is to commit his patient rather than to warn. Even in the absence of threat of civil liability, the doubts of psychiatrists as to the seriousness of patient threats have led psychiatrists to overcommit to mental institutions. This overcommitment has been authoritatively documented in both legal and psychiatric studies. (Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, supra,* 62 Cal.L.Rev. 693, 711 et seq.; Fleming & Maximov, *The Patient or His Victim: The Therapist's Dilemma,* 62 Cal.L.Rev. 1025, 1044-1046; Am. Psychiatric Assn. Task Force Rep. 8 (July 1974) Clinical Aspects of the Violent Individual, pp. 23-24; see Livermore, Malmquist & Meehl, *On the Justifications for Civil Commitment,* 117 U.Pa.L.Rev. 75, 84.) This practice is so prevalent that it has been estimated that "as many as twenty harmless persons are incarcerated for every one who will commit a violent act." (Steadman & Cocozza, *Stimulus/Response: We Can't Predict Who Is Dangerous* (Jan. 1975) 8 Psych. Today 32, 35.)

Given the incentive to commit created by the majority's duty, this already serious situation will be worsened, contrary to Chief Justice Wright's admonition "that liberty is no less precious because forfeited in a civil proceeding than when taken as a consequence of a criminal conviction." (*In re Gary W.* (1971) 5 Cal.3d 296, 307 [96 Cal.Rptr. 1, 486 P.2d 1201].)

Conclusion

In adopting the act, the Legislature fully recognized the concerns that must govern our decision today—adequate treatment for the mentally ill, safety of our society, and our devotion to individual liberty, making overcommitment of the mentally ill abhorrent. (§ 5001.) Again, the Legislature balanced these concerns in favor of nondisclosure (§ 5328), thereby promoting effective treatment, reducing temptation for overcommitment, and ensuring greater safety for our society. Psychiatric and legal expertise on the subject requires the same judgment.

The tragedy of Tatiana Tarasoff has led the majority to disregard the clear legislative mandate of the Lanterman-Petris-Short Act. Worse, the majority impedes medical treatment, resulting in increased violence from—and deprivation of liberty to—the mentally ill.

---

psychiatrist hearing the threat remains faced with potential crushing civil liability for a mistaken evaluation of his patient and will be forced to resolve even the slightest doubt in favor of disclosure or commitment.

We should accept legislative and medical judgment, relying upon effective treatment rather than on indiscriminate warning.

The judgment should be affirmed.

McComb, J., concurred.