# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-2298

GRETCHEN D. CUYLER, Special Administrator of
the Estate of Christian Cuyler, deceased,

*Plaintiff-Appellee,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 98 C 3786—**Blanche M. Manning**, *Judge.*

_____

ARGUED FEBRUARY 26, 2004—DECIDED MARCH 30, 2004

_____

Before BAUER, POSNER, and KANNE, *Circuit Judges.*

POSNER, *Circuit Judge.*  This is a suit for wrongful death
brought against the United States under the Federal Tort
Claims Act, which, with limitations that we can ignore,
makes the federal government liable for the torts of its em-
ployees to the same extent that they would be liable under
the law of the place where the tort was committed, in
this case Illinois. A trial in the district court resulted in a
judgment for the plaintiff for $4 million, from which the
government appeals.

In August of 1994, a woman named Higgs, babysitting for the family of a Navy enlisted man named Norman who was stationed at the Great Lakes Naval Base near Chicago, abused Norman's 14-month-old son. The abuse resulted in injuries that required the child's hospitalization at Great Lakes Naval Hospital, a federal facility. The medical personnel at the hospital, who are federal employees, failed to report the incident to the Illinois Department of Children and Family Services, as required by the state's Abused and Neglected Child Reporting Act (ANCRA), 325 ILCS 5/1 *et seq.* That it is a federal hospital that may or may not be subject to ANCRA is irrelevant to the government's liability under the tort claims act, for reasons explained in *Carter v. United States*, 333 F.3d 791, 795 (7th Cir. 2003).

Higgs said that the child's injuries had been caused by his falling down "the steps," presumably accidentally, but the medical personnel should have realized that the child was a victim of abuse rather than of accident. Indeed, they seem to have been suspicious, and asked the child's father whether he suspected abuse. He said he didn't know. They asked him whether he wanted them to report the incident as abuse, and he replied, "if that's what you're supposed to do, do your job." Mrs. Norman told her husband, "it doesn't look like [the child] fell down the steps; he was beat up," but it is unclear whether she told the medical personnel this.

The Act provides that any of a very long list of persons, ranging from physicians to foster parents, homemakers, and child-care workers and clearly encompassing the medical personnel who examined the Norman child, "having reasonable cause to believe a child known to them in their professional or official capacity may be an abused child or a neglected child shall immediately report or cause a report to be made to the Department." 325 ILCS 5/4. The statute provides criminal and disciplinary sanctions for willful

violations, *id.*, 5/4.02, but does not specify any purely civil sanctions, such as damages or injunctive relief. The government concedes that the medical personnel at Great Lakes Naval Hospital violated the Act by failing to report possible abuse of the Norman child.

Twenty-eight days after that incident, Higgs babysat for another Navy family at Great Lakes Naval Base, the Cuylers. Higgs abused the Cuylers' child, inflicting injuries that this time were fatal, and precipitating this lawsuit. (Higgs, though convicted of involuntary manslaughter for the death of the child, is not a defendant in this suit.) The plaintiff argues that her child's death was caused by the Navy personnel's violation of the Illinois abuse-notification statute in regard to the Norman child, and that either there is an implied right of action for damages under the statute, or, if not, then because the statute is intended for the protection of children such as the abused Cuyler child a violation of it is prima facie evidence of negligence under the common law of Illinois. The district court agreed with the plaintiff's second ground and therefore did not address the first, but the plaintiff as is her right asks us to affirm on the first if we disagree with the district court on the second. We begin with the second since it's the one the district court considered.

A conventional principle of tort law, in Illinois as elsewhere, is that if a statute defines what is due care in some activity, the violation of the statute either conclusively or (in Illinois) presumptively establishes that the violator failed to exercise due care. E.g., *Abbasi ex rel. Abbasi v. Paraskevoulakos*, 718 N.E.2d 181, 185 (Ill. 1999); *Marquay v. Eno*, 662 A.2d 272, 277 (N.H. 1995); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 36 (4th ed. 1984). But the statutory definition does not come into play unless the tort plaintiff establishes that the defendant owes a duty of care to the person

he injured (ordinarily the plaintiff, though in this case the plaintiff's decedent), because tort liability depends on the violation of a duty of care to the person injured by the defendant's wrongful conduct. E.g., *Ward v. K Mart Corp.*, 554 N.E.2d 223, 226-27 (Ill. 1990); *Kirk v. Michael Reese Hospital & Medical Center*, 513 N.E.2d 387, 395-96 (Ill. 1987); *Swett v. Village of Algonquin*, 523 N.E.2d 594, 597 (Ill. App. 1988).

Ordinarily the scope of the tort duty of care—whether it extends to bystanders, customers, investors, unforeseeable plaintiffs (as in the famous *Palsgraf* case), and so forth, see *Edwards v. Honeywell, Inc.*, 50 F.3d 484, 488-90 (7th Cir. 1995), and cases cited there—is given by the common law. E.g., *Ward v. K Mart Corp., supra*, 554 N.E.2d at 226-27; *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991); *Dunphy v. Gregor*, 642 A.2d 372, 377 (N.J. 1994); *Calkins v. Cox Estates*, 792 P.2d 36, 39 and n. 1 (N.M. 1990); *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 83 P.3d 322, 328-29 (Ore. 2004); *Bernethy v. Walt Failor's, Inc.*, 653 P.2d 280, 282 (Wash. 1982). And although the legislature can and sometimes does create a duty of care to a new class of injured persons, the mere fact that a statute *defines* due care does not in and of itself create a duty enforceable by tort law. E.g., *Board of Education v. Du Page County Election Comm'n*, 793 N.E.2d 954, 957-58 (Ill. App. 2003). The distinction is well explained in *Marquay v. Eno, supra*, 662 A.2d at 277: "whether or not the common law recognizes a cause of action, the plaintiff may maintain an action under an applicable statute where the legislature intended violation of that statute to give rise to civil liability. The doctrine of negligence *per se*, on the other hand, provides that where a cause of action does exist at common law, the standard of conduct to which a defendant will be held may be defined as that required by statute, rather than as the usual reasonable person standard." See also *Kansas State Bank & Trust Co. v. Specialized Transportation Services,*

*Inc.*, 819 P.2d 587, 603 (Kan. 1991). Otherwise every statute that specified a standard of care would be automatically enforceable by tort suits for damages—every statute in effect would create an implied private right of action—which clearly is not the law. The only modification required to make the passage that we quoted from the *Marquay* case an accurate statement of Illinois law is that in Illinois the violation of a statutory standard of care is prima facie evidence of negligence rather than negligence per se.

From this analysis it follows that only if the Illinois common law of torts imposed on the medical personnel of the Great Lakes Naval Hospital a duty of care to the Cuylers' child would the Illinois notification statute specify the level of care that they owed the child—specify, that is, that due care required taking steps to prevent Higgs from further babysitting until the circumstances in which the Norman child had been injured were clarified. In general, however, tort law imposes on people only a duty to take reasonable care to avoid injuring other people, and not a duty to rescue others from injuries by third parties, though there are exceptions. For the rule and its exceptions, see our recent discussion in *Stockberger v. United States*, 332 F.3d 479, 480-82 (7th Cir. 2003); for the rule in Illinois, see, e.g., *Parra v. Tarasco, Inc.*, 595 N.E.2d 1186, 1187-90 (Ill. App. 1992) ("the common law recognizes no general duty to aid a person in peril"). In other words, there is no general duty in the common law duty to be a "good Samaritan." This principle is well settled in Illinois, as elsewhere. Besides the *Parra* case, see, e.g., *Rhodes v. Illinois Central Gulf R.R.*, 665 N.E.2d 1260, 1270 (Ill. 1996); *Handzel v. Kane-Miller Corp.*, 614 N.E.2d 206, 208 (Ill. App. 1993); *Traudt v. City of Chicago*, 240 N.E.2d 188, 191-92 (Ill. App. 1968); *Lee v. GNLV Corp.*, 22 P.3d 209, 212 (Nev. 2001); *Restatement (Second) of Torts* § 314 (1965); Keeton et al., *supra*, § 56, pp. 375-76. That is why the plaintiff in this case needs the abuse-notification statute to

maintain this suit; she has no common law tort claim. (Needless to say, we have no authority to create good Samaritan liability under Illinois law.)

As we noted in *Stockberger*, "If *A* saw that *B* was about to be struck on the head by a flowerpot thrown from a tenth-story window, and *A* knew that *B* was unaware of the impending catastrophe and also knew that he could save *B* with a shout, yet he did nothing and as a result *B* was killed, still, *A*'s inaction, though gratuitous (there was no risk or other nontrivial cost to *A*) and even reprehensible, would not be actionable." 332 F.3d at 480-81. The result would not be changed if there were a statute that made it a crime to fail without justification to try to save an endangered person, unless the statute itself created, expressly or by implication, a tort remedy for its violation (the second issue in the present case, discussed below). If *B*'s survivors attempted to base liability on the fact that the legislature had declared that due care required a rescue attempt in the circumstances, they would be met with the argument that, while undoubtedly *A had* failed to exercise due care, that could not be a basis for liability because *A* had no duty *to B* to exercise due care.

It would be different if *A* had dropped the flowerpot on *B* and a statute provided that due care required avoiding tossing heavy objects out of upper-floor windows. For in that case, as a matter of tort law, *A* would have a duty to *B*, and the statute would show that he had violated the duty. The common law would create the duty, the statute would define it. That would be a case like *Doe v. Dimovski*, 783 N.E.2d 193 (Ill. App. 2003), on which the plaintiff relies heavily but unavailingly. For here, as in the indistinguishable case of *Parra v. Tarasco, Inc.*, *supra*, 595 N.E.2d at 1187-88, there was no duty. Also unavailing is the principle that one who begins a rescue though not required to do so

must carry it through nonnegligently, *Wakulich v. Mraz*, 785 N.E.2d 843, 854 (Ill. 2003); *Rhodes v. Illinois Central Gulf R.R.*, *supra*, 665 N.E.2d at 1273; *O'Brien v. City of Chicago*, 674 N.E.2d 927, 935 (Ill. App. 1996); *Commercial Union Ins. Co. v. DeShazo*, 845 So. 2d 766, 769 (Ala. 2002); *Folsom v. Burger King*, 958 P.2d 301, 310 (Wash. 1998); *Restatement*, *supra*, § 324; Keeton et al., *supra*, § 56, pp. 377-82, because his attempt at rescue may have deflected other rescuers. Suppose a person is drowning and one of the bystanders says, "Don't worry; I'm a powerful swimmer and I will save him," and so other bystanders, who are powerful swimmers, remain on shore. The would-be rescuer, however, is merely a braggart, and being a weak swimmer is unable to rescue the drowning person. He would be liable for the person's death. There is nothing of this sort here.

We said there were exceptions to the rule that there is no common law duty to warn or rescue. (We have just mentioned one.) The exception that comes closest to this case is where, as in the famous case of *Tarasoff v. Regents of University of California*, 551 P.2d 334 (Cal. 1976), a physician or other medical professional fails to warn the potential victims of his patient (whether the patient is a homicidal maniac, as in *Tarasoff*, or a Typhoid Mary). See also *Eckhardt v. Kirts*, 534 N.E.2d 1339, 1342-44 (Ill. App. 1989); *Novak v. Rathnam*, 505 N.E.2d 773, 775 (Ill. App. 1987); *Bradshaw v. Daniel*, 854 S.W.2d 865, 871-73 (Tenn. 1993); *Hofmann v. Blackmon*, 241 So. 2d 752 (Fla. App. 1970); cf. *Reisner v. Regents of University of California*, 37 Cal. Rptr. 2d 518 (App. 1995). Higgs was not the patient of anyone at Great Lakes Naval Hospital, and so the exception is inapplicable.

Thus Illinois common law did not impose on the hospital's employees a tort duty running to the Cuylers' child, but

we must consider whether the Illinois notification statute may have created such a duty. It did not do so expressly. The statute contains no reference to damages or other tort-type remedies. The only sanctions provided are criminal and disciplinary sanctions for willful violations. Nothing in the statute's text indicates that the legislature meant to expand the scope of tort liability to encompass people who fail to report child abuse and are thus analogous to bystanders who fail to intervene to prevent injuries by third parties. No Illinois case has addressed the question whether, nevertheless, the statute implicitly creates a private right to obtain damages (yet the plaintiff is adamant that we should *not* certify the question to the Supreme Court of Illinois). But an imposing line of cases from other jurisdictions dealing with the private-right question under very similar, indeed materially identical, child-abuse notification statutes, and using a standard similar to that used by the Illinois courts to determine whether to read a damages remedy into a statute ("implication of a private right of action is appropriate when (1) plaintiff is a member of the class for whose benefit the statute was enacted, (2) it is consistent with the underlying purpose of the statute, (3) plaintiff's injury is one the Act was designed to prevent, and (4) it is necessary to provide an adequate remedy for violations of the statute," *Noyola v. Board of Education*, 688 N.E.2d 81, 85 (Ill. 1997)), have held that a private right should *not* be implied. *Arbaugh v. Board of Education*, 591 S.E.2d 235, 241 (W. Va. 2003); *C.B. v. Bobo*, 659 So. 2d 98, 102 (Ala. 1995); *Perry v. S.N.*, 973 S.W.2d 301, 309 (Tex. 1998); *Marquay v. Eno*, *supra*, 662 A.2d at 278; *Kansas State Bank & Trust Co. v. Specialized Transportation Services, Inc.*, *supra*, 819 P.2d at 603-04; *Valtakis v. Putnam*, 504 N.W.2d 264, 266 (Minn. App. 1993); *Cechman v. Travis*, 414 S.E.2d 282, 283-84 (Ga. App. 1991); *Bradley v. Ray*, 904 S.W.2d 302, 312-14 (Mo. App. 1995); *Fischer v. Metcalf*, 543 So. 2d 785, 788-91 (Fla. App. 1989); *Borne by Borne v.*

*Northwest Allen County School Corp.*, 532 N.E.2d 1196, 1203 (Ind. App. 1989); but see *Landeros v. Flood*, 551 P.2d 389, 396-98 (Cal. 1976).

We think that those decisions are correct (the one outlier, *Landeros*, is not in point, as the court confined private actions to deliberate violations of the statute at issue) and that the Supreme Court of Illinois will fall in line with them, especially given that court's increasing reluctance to imply private rights of action, a reluctance well illustrated by its very recent decision in *Metzger v. DaRosa*, No. 95913, 2004 WL 335025 (Ill. Feb. 20, 2004). It is of some significance that in the almost 30 years in which ANCRA has been on the books, no cases have been reported in which a tort suit was premised on a failure to report potential abuse, in violation of the statute.

The fact that the only sanction the legislature has provided is for a *willful* violation (which is not alleged in this case) suggests a reluctance to impose liability for merely negligent violations, and this is understandable for a variety of reasons. One is that the legislators were clearly worried about the harm to people falsely or mistakenly accused of child abuse, and so imposed a criminal penalty for knowingly false reporting. 325 ILCS 5/4. Another is the vast range of persons encompassed by the reporting requirement. A "homemaker" who not willfully but merely carelessly failed to report suspected abuse by a babysitter, perhaps fearing that the babysitter would sue her for defamation, see *Brown v. Farkas*, 511 N.E.2d 1143, 1146-47 (Ill. App. 1986); *Bogosian v. Board of Education*, 134 F. Supp. 2d 952, 954-55 (N.D. Ill. 2001), might on the plaintiff's view of the statute find herself sued years later because the babysitter had abused *another* child.

Maybe such encompassing liability would be a good thing; it would doubtless lead to more reporting. It is

usually the case that piling on punishments will increase compliance with a statute. But if that were the only consideration, all statutes would be interpreted to create private rights of action. Such piling on in the case of ANCRA would place even nonprofessionals, such as homemakers, on a razor's edge, where they could be faced with suit whether they did or did not report an incident that might involve child abuse. It is true that there is a statutory safe harbor for "good faith" mistaken reporting of abuse and even a presumption of good faith, 325 ILCS 5/9, but what is good faith in a particular case remains a litigable issue. It may be significant that since being enacted, the abuse-notification statute has been amended several times, any one of which would have provided an occasion for plugging in a damages remedy had there been legislative sentiment for such a remedy; evidently there was not.

Another point, this one well illustrated by the facts of this case and a possible reason behind the common law's settled reluctance to create good Samaritan liability (part of a more general conservatism, further illustrated by the common law's refusing to create a remedy in cases of wrongful death—in Illinois as elsewhere, suits for wrongful death are entirely creatures of statute, *Pasquale v. Speed Products Engineering*, 654 N.E.2d 1365, 1378 (Ill. 1995); *Florida Convalescent Centers v. Somberg*, 840 So. 2d 998, 1001 (Fla. 2003); *Franklin v. Franklin ex rel. Phillips*, 858 So. 2d 110, 115 (Miss. 2003); *Etling v. Westport Heating & Cooling Services, Inc.*, 92 S.W.3d 771, 773 (Mo. 2003) (en banc)), is that issues of causation tend to be more difficult to resolve in a case of nonfeasance, which is what good Samaritan liability is, than in one of misfeasance. See Keeton et al., *supra*, § 56, p. 376. Suppose the Great Lakes Naval Hospital had promptly reported the abuse of the Norman child to the state's child welfare department. What would have ensued? Would Higgs, who did not admit having abused the child, have

been arrested? Probably not without an investigation, which might have taken more than 28 days to complete. Of course, just the commencement of an investigation might well have deterred her from further child abuse, but that is speculation too. The speculative character of causal inquiries in good Samaritan cases is another reason to doubt that the Illinois legislature intended to create tort liability by enacting a statute that does not purport to do so.

We conclude that the judgment for the plaintiff must be reversed and the suit dismissed.

REVERSED.


A true Copy:

       Teste:


                              _____
                              *Clerk of the United States Court of*
                              *Appeals for the Seventh Circuit*