First Division
August 7, 2006

No. 1-05-3718

RAYNOLDO VARELA, a Minor, by his Mother      )
and Next Friend, Rachel A. Nelson, and       )
RACHEL A. NELSON, Individually,              ) Appeal from
                                             ) the Circuit Court
    Plaintiffs-Appellants              ) of Cook County
                                             )
        v.                             ) 02 L 003426
                                             )
                                             ) Honorable
ST. ELIZABETH'S HOSPITAL OF CHICAGO, INC.,   ) Kathy M. Flanagan,
Luis E. Gomez, M.D., and Mesa EmCare,        )
S.C.,                                        ) Judge Presiding
                                             )
    Defendants-Appellees.

JUSTICE McBRIDE delivered the opinion of the court:

In this medical negligence suit, the plaintiffs, Raynoldo Varela, a minor, and his mother Rachel A. Nelson, appeal from an order of the circuit court granting summary judgment to the defendants, emergency room physician Dr. Luis E. Gomez, M.D., his employer Mesa EmCare, S.C. (Mesa EmCare), and the hospital where Dr. Gomez treated Raynoldo on June 8, 1997, St. Elizabeth's Hospital of Chicago, Inc. (St. Elizabeth's).[1] The summary judgment ruling was based on the court's determination that the emergency room physician and St. Elizabeth's nurses did not owe a common law duty of care to their minor patient to discover a past injury and report it as suspected child abuse to his mother and the Illinois Department of Children and Family Services (DCFS),

---

[1] The hospital, located at 1431 North Claremont Avenue, is now part of Saints Mary and Elizabeth Medical Center.

1-05-3718

and that the healthcare personnel's conduct was not the proximate cause of physical abuse subsequently inflicted by Raynoldo's father. The court also denied the plaintiffs leave to file a proposed third amended complaint, which alleged Raynoldo's injuries were attributable in part to the negligence of unnamed physicians and nurses on a subsequent workshift at the hospital who did not follow up when a radiologist's report about Raynoldo's chest X ray noted the presence of healed rib fractures. The court characterized the new allegations as a new theory that was untimely and would not cure the deficient allegations of duty and proximate cause. In their appeal, Raynoldo and Rachel contend the court's misapprehension of Illinois law regarding duty and proximate cause led the court to erroneously enter summary judgment for the defense and abuse its discretion by denying leave to file the proposed amended pleading.

The record on appeal discloses the following. Raynoldo was born prematurely on March 31, 1997, to Rachel and her boyfriend Kikole Varela. At the time, Rachel was 17 years old and Kikole was 18 years old. Out of concern that Raynoldo was experiencing seizures, he was placed on a phenobarbital regimen. During a "well baby" checkup on April 18, 1997, Rachel reported that Raynoldo was sometimes gasping for air and breathing fast. The

2

doctor's notes reflect that Raynoldo was a healthy 18-day-old boy and that he was experiencing "periodic breathing," which was a normal condition that he would probably outgrow. On the morning of June 8, 1997, when Raynoldo was nine weeks old, his parents brought him to the emergency room at St. Elizabeth's, with complaints of difficulty breathing and increased crying since noon the previous day, when Rachel started him on a new infant formula, Similac with iron. According to Rachel, she also told "the emergency room nurse and doctor" about a "clicking feeling in [her] baby's back." The medical records indicate Rachel denied Raynoldo experienced a fever, vomiting, lethergy, or recent seizures. Dr. Gomez examined Raynoldo and noted he was an active infant with a strong grasp. Raynoldo moved all his extremities and his crying was consolable. His chest was clear, his lungs were working well, and his oxygen saturation was 100%. His pupils were equal, round, and reactive to light. Raynoldo drank Pedialyte while in the emergency room and Dr. Gomez ruled out the need to hydrate the child with a saline solution. The doctor noted that Raynoldo's abdomen was soft and that there were active bowel sounds. However, he also noted that Raynoldo's abdomen was moderately distended and that there was some initial voluntary guarding of the abdomen when the doctor started his exam. Dr. Gomez found no evidence of blood in the stool, and blood testing he ordered showed a normal white blood count, normal hemoglobin, and normal blood sugar. Dr. Gomez also

ordered a chest X ray because of the initial complaint of difficulty breathing. He wanted to assure Rachel that Raynoldo was breathing normally and was not suffering from an acute or "significant process such as pneumonia or some other cause for an inability to breathe." According to Dr. Gomez's deposition testimony, he studied the X-ray film for pneumonia, a dropped lung, or anything that would have suggested abnormal lung tissue, and he saw no evidence of an explanation for difficulty breathing. He did not see any indication of the healed fractures on Raynoldo's lower left ribs, but if he had, Dr. Gomez stated he would have asked about prior injuries, because absent some other explanation, rib fractures in an infant are indicative of abuse. According to the doctor, his expertise was in emergency medical intervention, meaning he could diagnose obvious features in X rays and stabilize patients but was not proficient in discerning subtle features in X rays. Dr. Gomez took into account that Raynoldo's crying began shortly after being started on the Similac formula with iron a day earlier and that iron is "notorious for slowing the gut and distending the gut." Also, "It's very common for a child to cry if the child has [intestinal] colic and to be perceived by a parent [or other observer] as perhaps having difficulty breathing." In addition, a child and even an adult will "tend to hyperventilate" when his or her "abdomen is uncomfortable." After considering Raynoldo's history and the results of the physical exam and diagnostic

tests, Dr. Gomez concluded that Raynoldo was suffering from intestinal colic.  Dr. Gomez discharged Raynoldo with instructions to discontinue the new Similac formula, to give Pedialyte, to return immediately if there was fever or vomiting, and to follow up with a pediatrician in the morning.

The written discharge instructions informed Raynoldo's parents that a radiologist would perform an official interpretation of the chest X ray the following morning and that they should have the child's doctor call for a copy of the radiologist's report.  The discharge instructions also said either Raynoldo's parents or his doctor would be notified if there was a discrepancy between the findings of the emergency department physician and the radiologist.

Raynoldo was seen by a pediatrician the following day.  The pediatrician's notes describe Raynoldo as a healthy two-month old.  He was alert and active during the examination, his lungs were clear, and his abdomen was soft and not distended.  The notes do not reflect whether the doctor was advised of the previous day's emergency room visit.

On the morning of June 9, 1997, Dr. Ahmad Judar, a board-certified radiologist at St. Elizabeth's, reviewed Raynoldo's X ray and made a written report.  Dr. Judar documented:

> "The heart is normal in size.  There appears to be hyperinflated lungs.  No evidence of pneumonia or edema.  There is

5

> evidence of old healed fracture at the left
> lower ribs involving 7th, 8th and 9th ribs.
>
> Conclusion: Hyperinflated lungs,
> bronchiolitis should be considered. Old
> healed fracture at the left lower ribs
> appears to be involving the 7th, 8th and 9th
> ribs at the axillary area."

When Dr. Judar was deposed on July 12, 2004, he no longer recalled this particular report. However, he described the usual procedure. He indicated a "flash card" or preliminary written report of the emergency room doctor accompanies X-ray film sent to the radiology department. If a discrepancy is seen, the radiologist authors a report, makes a handwritten note on the flash card, and returns the documents to the emergency room. Due to the close proximity of Dr. Judar's office and the emergency room, Dr. Judar's routine practice is to hand deliver discrepancies to "the nurse or to the doctor." Dr. Judar did not recall noting a discrepancy on Raynoldo's flash card, returning this particular flash card to the emergency room, or if he ahd spoken with Dr. Gomez or any other emergency room personnel about Raynoldo. In Dr. Judar's opinion, Raynoldo's healed fractures were at least five weeks old, could be as many as eight weeks old, and could have resulted from birth trauma, a fall from a couch, or abuse. Raynoldo's old injuries were revealed as little bulging irregularities in the ribs. By the time the X ray was

taken, the bone density had become homogeneous, there was no difference in coloration, and what remained were "minimal changes." The minimal changes would be "rather obvious" to a radiologist but not to the emergency room physicians that Dr. Judar had worked with. A view from the left ribs would have revealed more than the chest X ray that was taken. The radiologist's role was to report the discrepancy to the emergency room, and the physician's role was to decide what to do about it, including whether to order more films.

St. Elizabeth's emergency department manual likewise states that it is the responsibility of the emergency department physician on duty to evaluate a reported X ray discrepancy and determine the action to be taken. The manual further provides that if a suspected child abuse victim comes to the emergency room, the individual is to be treated and immediate calls are to be placed to the police department and DCFS.

The record indicates Dr. Gomez was not on duty on June 9, 1997, when the radiologist prepared his report of Raynoldo's X ray. Dr. Gomez did not receive a copy of Dr. Judar's report and he did not know whether anyone in the radiology department, including Dr. Judar, followed up with anyone in the emergency department.

On Saturday afternoon, July 26, 1997, while Kikole and Raynoldo were sleeping, Rachel left their apartment for approximately 30 minutes to cool off under an open fire hydrant.

When she returned, the baby was crying and Kikole was holding him. The baby was crying strongly and acting strangely, but he eventually fell asleep and remained asleep until late that night. When he awoke, Rachel fed Raynoldo some formula, but he began projectile vomiting, and threw up more than he had just eaten. Rachel and Kikole took Raynoldo to the hospital emergency room, where doctors discovered a subdural hematoma and 11 rib fractures in various stages of healing. The medical personnel diagnosed "shaken baby syndrome" and immediately reported the situation to DCFS and the police department as a case of suspected child abuse. Approximately a week later, Kikole confessed to shaking the baby on three occasions -- June 15, 1997, which was after Dr. Gomez examined Raynoldo; July 7, 1997; and July 26, 1997. Kikole was convicted of aggravated battery to a child and incarcerated. Raynoldo suffered permanent neurological damage and partial blindness in his right eye. He receives ongoing treatment, including occupational therapy and speech therapy sessions while at school.

On March 20, 2002, Rachel and Raynoldo filed their original complaint against Dr. Gomez and the hospital, alleging a violation of the Abused and Neglected Child Reporting Act (Reporting Act) (325 ILCS 5/4 (West 2002)). Attached to the complaint was a letter written by emergency physician Eugene E. Saltzberg, stating in relevant part:

> "No attempt to evaluate a potential child

abuse situation was made on [June 8, 1997,] nor any other date by the staff of St. Elizabeth's Hospital.  Multiple rib fractures indicate child abuse until proven otherwise.  Subsequently, this child was the victim of further abuse resulting in permanent, significant neurological injury.  Had the original injuries been looked into, it is my opinion that, more likely than not, further injury would not have occurred.  Therefore, it is my opinion that [Dr. Gomez, St. Elizabeth's], and any other medical staff members involved in [Raynoldo's] care at St. Elizabeth's hospital provided care below the standard acceptable for any medical practitioner, and that the deviation from the standard of care resulted in further irreparable injury."

The Reporting Act does not expressly provide for a private right of action in the event of a violation and an implied private right of action was rejected by the Third District in *Doe 1 v. North Central Behavioral Health Systems, Inc.*, 352 Ill. App. 3d 284, 286, 816 N.E.2d 4, 6 (2004).  Although the Third District case involved a psychology clinic which did not report that one

1-05-3718

of its patients was sexually abusing children and the patient went on to abuse other children, the court's reasoning appears equally applicable to other types of relationships. The Third District questioned whether a private remedy would be consistent with the underlying purpose of Reporting Act, since the statute is designed to enhance the ability of DCFS to "'protect the health, safety, and best interests of the child in all situations in which the child is vulnerable to child abuse or neglect.'" *North Central Behavioral Health*, 352 Ill. App. 3d at 287, 816 N.E.2d at 7, quoting 325 ILCS 5/2 (West 2002). The court pointed out, "[n]owhere is it either explicitly stated or implied that a purpose of the Reporting Act is to provide children or families with compensation for *** abuse or a failure to report abuse." *North Central Behavioral Health*, 352 Ill. App. 3d at 287, 816 N.E.2d at 7. In addition, although the plaintiff family argued that finding an implied private cause of action for a failure to report would lead to enhanced enforcement of the Reporting Act, the court emphasized that the "same argument could be made of almost any statute." *North Central Behavioral Health*, 352 Ill. App. 3d at 287, 816 N.E.2d at 7. Furthermore, there was no evidence "that the statute does not already adequately serve its purpose, absent a private cause of action." *North Central Behavioral Health*, 352 Ill. App. 3d at 287, 816 N.E.2d at 7. This fact was significant because a cause of action "should only be implied in a statute 'in cases where the statute would be

10

1-05-3718

ineffective, as a practical matter, unless such an action were implied.'" *North Central Behavioral Health*, 352 Ill. App. 3d at 287-88, 816 N.E.2d at 7, quoting *Fisher v. Lexington Health Care, Inc.*, 188 Ill. 2d 455, 464, 722 N.E.2d 1115, 1119-20 (1999). The Reporting Act provides criminal sanctions for wilful failure to report, and the Third District plaintiffs gave no indication this penalty was insufficient to ensure statutory compliance. *North Central Behavioral Health*, 352 Ill. App. 3d at 288, 816 N.E.2d at 8, citing 325 ILCS 5/4.02 (West 2002).[2] Accordingly, even though the Third District plaintiffs were "members of the class of individuals who are to be protected by the Reporting Act, and even though the harm suffered by the children was of the type the statute was designed to prevent," the Third District found there

---

[2] In addition to the criminal sanctions noted by the Third District, we also point out that the Reporting Act provides the potential to fine or revoke the license of a physician that wilfully violates the statute. See 325 ILCS 5/4.02 (West 2002) (section of the Reporting Act stating that any physician who wilfully fails to report suspected abuse or neglect shall be referred to the Illinois State Medical Disciplinary Board for disciplinary action); 225 ILCS 60/22(A)(22) (West 2002) (providing a range of penalties, including $10,000 fine and license revocation, for physician's wilful failure to report an instance of suspected abuse or neglect as required by law).

11

1-05-3718

was no implied private cause of action for violation of the Reporting Act. *North Central Behavioral Health*, 352 Ill. App. 3d at 288, 816 N.E.2d at 8.

Dr. Gomez moved to dismiss Rachel and Raynoldo's original complaint on the ground that the Reporting Act does not give rise to a private cause of action, and his motion was granted.

With leave of court, Rachel and Raynoldo filed a first amended complaint on August 22, 2002. The first amended complaint omitted the prior references to the Reporting Act and indicated the defendants negligently breached a common law duty that medical professionals owe to their patients. Count I of the first amended complaint was directed at Dr. Gomez based on his "professional[] negligen[ce]" in caring for Raynoldo, and count II was directed at St. Elizabeth's based on the "professional[] negligen[ce]" of its emergency room nursing staff in caring for Raynoldo. More specifically, the plaintiffs alleged Dr. Gomez was subject to a "duty to possess the knowledge and apply the skill and care that reasonably qualified physicians practicing in their respective specialities in the Chicago metropolitan community, or similar communities, would possess and apply in similar cases under similar circumstances." It was further alleged that St. Elizabeth's nursing staff was subject to a "duty *** to possess the knowledge and apply the skill and care that reasonably well qualified nurses practicing in the Chicago metropolitan area or similar communities would ordinarily possess

12

and apply in similar cases under similar circumstances."

According to the plaintiffs, Dr. Gomez and the nursing staff violated their alleged duties to Raynoldo when they:

"a.  Negligently failed to advise the minor's parent, Rachel A. Nelson, of the suspected abuse of the minor, Raynoldo Varela, when X-rays revealed that Raynoldo had several fractured ribs;

b.  Negligently failed to investigate and evaluate a potential child abuse situation when X-rays revealed that Raynoldo had several fractured ribs; and,

c.  Negligently failed to report suspected abuse of Raynoldo Varela to [DCFS] when X-rays revealed that Raynoldo had several fractured ribs."

In both counts I and II of the first amended complaint, the plaintiffs sought damages for Raynoldo's medical expenses, pain and suffering, loss of a normal life, and lost earning capacity. In count III, Rachel sought compensation for Raynoldo's medical expenses, pursuant to the family expense statute (750 ILCS 65/15 (West 2002)).

On November 21, 2003, the plaintiffs deposed Dr. Gomez. Dr. Gomez informed the plaintiffs that he did not receive the radiologist's report that was written after Dr. Gomez's treated

1-05-3718

Raynoldo.

According to the plaintiffs, they voluntarily filed a second amended complaint on July 24, 2003, which added Mesa EmCare as a defendant, because the plaintiffs learned through discovery that Mesa EmCare contracted to operate the emergency room at St. Elizabeth's and that Dr. Gomez was employed by Mesa EmCare rather than the hospital. Although the plaintiffs had also learned through discovery that Dr. Gomez was not on duty when Dr. Judar reviewed Raynoldo's chest X ray, the plaintiffs did not add any allegations regarding the physicians or nurses that were on duty at that point in time.

Dr. Gomez and Mesa EmCare filed a motion for summary judgment, and St. Elizabeth's joined in the motion. Rachel and Raynoldo responded and moved for leave to file a third amended complaint. As indicated above, after considering the parties' arguments, the court ruled against the plaintiffs as to both motions and this appeal followed. The court's written order states:

"It is alleged that the [defendants'
negligent failure to discover a prior injury
and report it as suspected child abuse to the
child's mother and DCFS] resulted in the
child's father abusing the child at a later
date. There is no duty here. While doctors

14

and hospitals have certain reporting requirements with regard to child abuse pursuant to the [Reporting Act], these [statutory] requirements do not translate into a standard of care with respect to treating a patient nor do the failure to meet those requirements become the basis of a private right of action. There is no evidence here of a failure to diagnose which resulted in a medical injury. Instead, liability is based on the failure to discover a past injury and report that injury as suspected child abuse which resulted in a third-party inflicting abuse at a later point in time. There is no duty here on that basis. In addition, the evidence in the record does not support proximate cause. There is no causal nexus between the Defendants' failure to discover and report past suspected abuse and the injury sustained at a later date as a result of future abuse. There is nothing in the 213 answers or other evidence which [is] capable of supporting this. Further, the Plaintiffs seek to amend the pleading [so as] to change the theory of

15

1-05-3718

> liability against EmCare from merely being based on vicarious liability for Dr. Gomez's acts and omissions to liability for the failures of any EmCare physician with respect to a June 9, 1997 radiologist's report. Not only is this a new theory which has been sought to be pled much too late, but even if it were pled, the lack of proximate cause and duty still applies. Accordingly, any proposed amendment would not preclude summary judgment."

Summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits on file establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2002); *Siklas v. Ecker Center for Mental Health, Inc.*, 248 Ill. App. 3d 124, 129, 617 N.E.2d 507, 510 (1993). An order granting summary judgment is addressed *de novo* on appeal. *Rivera v. Arana*, 322 Ill. App. 3d 641, 646, 749 N.E.2d 434, 439 (2001).

In order to succeed on a common law negligence claim, the plaintiff must show a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately resulting from that breach. *Swett v. Village of Algonquin*, 169

16

1-05-3718

Ill. App. 3d 78, 82, 523 N.E.2d 594, 597 (1988). Rachel and Raynoldo contend the Reporting Act is not at issue and that the premise of their case is the defendants' negligent "violation of a common law duty." Rachel and Raynoldo make numerous statements in their appellate briefs such as "there is clearly a common law duty owed by Dr. Gomez (Mesa EmCare and St. Elizabeth's Hospital) to their patient," they "owed him a common law duty born from the physician/patient relationship." Also, "the common law already requires a duty of care and [the Reporting Act] simply helps define what the duty is." As the plaintiffs, however, Rachel and Raynoldo bear the burden of showing that Dr. Gomez owed a common law duty of care to his patient that would subject the doctor to liability for the abuse the patient subsequently suffered at the hands of his own father. It is not enough for the plaintiffs to state their subjective belief about the type and scope of duty that was owed. Whether a legal duty exists is a question of law to be determined by the court. *Swett*, 169 Ill. App. 3d at 82, 523 N.E.2d at 597. The plaintiffs must provide legal authority substantiating that the courts of this jurisdiction have determined that physicians owe this particular duty to their patients, or the plaintiffs must provide legal reasoning substantiating that this court should now determine that physicians owe this particular duty to their patients. If the plaintiffs cannot substantiate the duty element of their negligence claim, we do not need to address the additional

17

1-05-3718

elements of their claim, including breach of that duty and an injury proximately resulting from that breach.

The Third District case discussed above, *North Central Behavioral Health Systems*, would appear to dispense with the plaintiffs' theory, since it would be illogical to argue that although the Illinois legislature has not expressly or impliedly created a private right of action for violation of the Reporting Act (*North Central Behavioral Health Systems*, 352 Ill. App. 3d at 286, 816 N.E.2d at 6), individuals may nevertheless assert a private right of action for violation of the Reporting Act, so long as those individuals allege they are proceeding at common law rather than on a statutory basis. Nevertheless, the plaintiffs cite *Dimovski* and *Culyer* for the proposition that Dr. Gomez owed Raynoldo a common law duty of care to "diagnose [healed] rib fractures and thus determine that [the child] was being physically abused" and then "report such child abuse to the police, DCFS and the parents." *Doe v. Dimovski*, 336 Ill. App. 3d 292, 783 N.E.2d 193 (2003); *Cuyler v. United States*, 362 F.3d 949 (7th Cir. 2004). While these cases concern a failure to report abuse, they do not support the present appeal, because they do not indicate the hospital personnel owed this particular duty of care to their minor patient.

In *Dimovksi*, a Westmont (Du Page County) high school student was sexually abused by a teacher and brought a "negligent retention" action against the school board that employed him.

18

1-05-3718

*Dimovski*, 336 Ill. App. 3d at 294, 783 N.E.2d at 195. The student alleged the school board "owed a duty to its students to provide and employ appropriate educational services and competent teachers and counselors and to safeguard its students from harmful conduct that might be undertaken by its teachers." *Dimovski*, 336 Ill. App. 3d at 294-95, 783 N.E.2d at 196. The student alleged the school board breached these duties in part by failing to hire competent personnel and failing to investigate and report to DCFS previous complaints against the teacher regarding sexual misconduct with another student. *Dimovski*, 336 Ill. App. 3d at 295, 783 N.E.2d at 196. The trial court found, however, that the school board was immunized from liability for its employee's misconduct in part by section 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/2-201 (West 2000) (Tort Immunity Act)), and dismissed the complaint. *Dimovski*, 336 Ill. App. 3d at 295, 783 N.E.2d at 196-97.

Focusing on the alleged failure to report suspected child abuse and the Reporting Act's inflexible wording, the appellate court found that because the Reporting Act did not allow the school district any discretion or policymaking as to whether to report suspected child abuse, section 2-201 of the Tort Immunity Act was not a basis for dismissing the student's complaint. *Dimovski*, 336 Ill. App. 3d at 297, 783 N.E.2d at 198; 325 ILCS 5/1 *et seq.* (West 2002); 745 ILCS 10/2-201 (West 2002).

19

1-05-3718

Notably, the duty element of the negligent retention action was not in dispute and the court did not discuss whether the school board in fact "owed a duty to its students to provide and employ appropriate educational services and competent teachers and counselors and to safeguard its students from harmful conduct that might be undertaken by its teachers." *Dimovksi*, 336 Ill. App. 3d at 294-95, 783 N.E.2d at 196. In addition, the Westmont school board's relationship with the abusive teacher is not analogous to Dr. Gomez's relationship with Raynoldo's abuser; Dr. Gomez did not employ, supervise, or otherwise control Raynoldo's abuser. Therefore, there is no discussion or analogous relationship in *Dimovski* that would lead us to conclude that Dr. Gomez owed the type of duty to his minor patient that the plaintiffs are now arguing was owed. *Dimovski* has no apparent relevance to the contention that Dr. Gomez owed a common law duty to his patient to detect a healed injury, to diagnose it as an indication of child abuse, and to report it as such to the child's mother and child welfare authorities.

The other case the plaintiffs cite is even less helpful to their appeal. In *Cuyler*, a babysitter, Higgs, abused the son of a military family so severely that the child had to be hospitalized at the Great Lakes Naval Base. *Cuyler*, 362 F.3d at 951. Although Higgs attributed the boy's injuries to an accidental fall from some steps, the staff at the military hospital suspected he was the victim of abuse rather than an

20

1-05-3718

accident. *Cuyler*, 362 F.3d at 951. The hospital staff asked the father whether he also suspected abuse, and the father responded that he did not know. *Cuyler*, 362 F.3d at 951. The hospital staff asked the father whether he wanted them to report the incident as abuse, and he replied, "'if that's what you're supposed to do, do your job.'" *Cuyler*, 362 F.3d at 951. Nevertheless, the hospital staff did not report their suspicions, in violation of the Reporting Act. *Cuyler*, 362 F.3d at 951; 325 ILCS 5/1 *et seq.* (West 2002). Within a month, Higgs babysat for a second military family and inflicted fatal injuries on their child. *Cuyler*, 362 F.3d at 951. Higgs was convicted of involuntary manslaughter for the death of the child, and the parents of this second child brought a wrongful death action. *Cuyler*, 362 F.3d at 951. The parents brought suit in the federal court system, under the Federal Tort Claims Act which, "with limitations that we can ignore, makes the federal government liable for the torts of its employees to the same extent that they would be liable under the law of the place where the tort was committed, in this case Illinois." *Cuyler*, 362 F.3d at 951. Thus, although the suit proceeded in the federal court system, Illinois state law was controlling. *Cuyler*, 362 F.3d at 951. Litigation led to a $4 million judgment in the parents' favor, and an appeal was taken. *Cuyler*, 362 F.3d at 951.

The parents tried to persuade the federal appeals court that because the Reporting Act is intended for the protection of

21

1-05-3718

children such as theirs, the hospital staff's violation of their reporting obligation was *prima facie* evidence of negligence under the common law of Illinois. *Cuyler*, 362 F.3d at 951; 325 ILCS 5/1 *et seq.* (West 2002). The federal court rejected this argument. The court reasoned that generally there is no common law duty to warn or rescue others from injuries inflicted by third parties, and unless the plaintiff family came within an exception to the general rule of no duty, which it did not, the court could not look to the statute for the definition of the standard of care. *Cuyler*, 362 F.3d 949.

More specifically, the court reasoned as follows. "A conventional principle of tort law, in Illinois as elsewhere, is that if a statute defines what is due care in some activity, the violation of the statute either conclusively or (in Illinois) presumptively establishes that the violator failed to exercise due care." *Cuyler*, 362 F.2d at 952. The federal court stressed, however, "But the statutory definition does not come into play unless the tort plaintiff establishes that the defendant owes a [common law] duty of care to the person he injured *** because tort liability depends on the violation of a duty of care to the person injured by the defendant's wrongful conduct." *Cuyler*, 362 F.2d at 952. Ordinarily the scope of a tort duty of care is stated in a jurisdiction's case law, and "although the legislature can and sometimes does create a duty of care to a new class of injured persons, the mere fact that a

22

1-05-3718

statute *defines* due care does not in and of itself create a duty enforceable by tort law." (Emphasis in original.) *Cuyler*, 362 F.3d at 952.

> "The distinction is well explained in *Marquay v. Eno,* [139 N.H. 708, 713, 662 A.2d 272, 277 (1995)]: 'whether or not the common law recognizes a cause of action, the plaintiff may maintain an action under an applicable statute where the legislature intended violation of that statute to give rise to civil liability. The doctrine of negligence *per se,* on the other hand, provides that where a cause of action does exist at common law, the standard of conduct to which a defendant will be held may be defined as that required by statute, rather than as the usual reasonable person standard.' *** Otherwise every statute that specified a standard of care would be automatically enforceable by tort suits for damages -- every statute in effect would create an implied private right of action -- which clearly is not the law. The only modification required to make the passage that we quoted from the *Marquay* case an accurate statement of Illinois law is that

23

1-05-3718

> in Illinois the violation of a statutory
> standard of care is *prima facie* evidence of
> negligence rather than negligence per se."
> *Cuyler*, 362 F.3d at 952.

"From this analysis it follows that only if the Illinois common law of torts imposed on the medical personnel of the Great Lakes Naval Hospital a duty of care to the [second family's] child would the Illinois [Reporting Act] specify the level of care that they owed to the child -- specify, that is, that due care required taking steps to prevent Higgs from further babysitting until the circumstances in which the [first family's] child had been injured were clarified." *Cuyler*, 362 F.2d at 952-53. "In general, however, tort law imposes on people only a duty to take reasonable care to avoid injuring other people and not a duty to [warn or] rescue others from injuries by third parties." *Cuyler*, 362 F.3d at 953. "In other words, there is no general duty in the common law *** to be a 'good Samaritan.'" *Cuyler*, 362 F.3d at 953.

The federal court briefly discussed the *Tarasoff* exception to the general rule that there is no common law duty of care to warn or rescue others from injuries inflicted by third parties. *Cuyler*, 362 F.3d at 954, citing *Tarasoff v. Regents of University of California*, 17 Cal. 3d 425, 551 P.2d 334, 131 Ca. Rptr. 13 (1976). According to *Tarasoff*, when a psychotherapist determines that his patient presents a serious danger of violence to

24

1-05-3718

another, the therapist incurs a duty to contact the intended victim, notify the police, or take other steps reasonably necessary under the circumstances. *Tarasoff*, 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14. The federal court then found, "Higgs [the violent babysitter] was not the patient of anyone at Great Lakes Naval Hospital, and so the [*Tarasoff*] exception is inapplicable." *Cuyler*, 362 F.3d at 954.

Thus, *Cuyler* stands for the propositions that (1) there is no duty under the Illinois common law of torts or the Reporting Act (325 ILCS 5/1 *et seq.* (West 2002)) to rescue others from being injured by third parties, and (2) a plaintiff proceeding under the common law must first establish that the defendant owed a common law duty of care to the person he injured before a court will look to a statute to define the specific level of care that was owed. Therefore, the case that is at the center of the plaintiffs' duty of care argument actually supports summary judgment for Dr. Gomez and the other defendants.

It appears that Rachel and Raynoldo misread *Cuyler*, since they contend the court determined the hospital staff "did not owe a common law duty to Cuyler [the second family's child] since he was not their patient." See *Cuyler*, 362 F.3d 949. As summarized above, however, the court began with the general rule that there is no duty under the Illinois common law of torts to warn or rescue others from being injured by third parties, then considered whether an exception should be made, but concluded

25

1-05-3718

since "[the abusive babysitter] Higgs was not the patient of anyone at Great Lakes Naval Hospital, *** the exception is inapplicable." *Cuyler*, 362 F.3d at 954.

*Cuyler* works against Rachel and Raynoldo for the additional reason that the federal appeals court, like the Third District in *North Central Behavioral Health Systems*, 352 Ill. App. 3d at 288, 816 N.E.2d at 8, determined that the Reporting Act does not create a private right of action for damages. *Cuyler*, 362 F.3d at 955. As an alternative to their common law duty argument, the military family argued their child's death was caused by the hospital's violation of the abuse-notification statute with respect to the other military family's abused child. *Cuyler*, 362 F.3d at 951. Like the Third District, the federal appeals court determined the Reporting Act did not create an express or implied private cause of action for a failure to report. It pointed out:

> "Maybe such encompassing liability would be a good thing; it would doubtless lead to more reporting. It is usually the case that piling on punishments will increase compliance with a statute. But if that were the only consideration, all statutes would be interpreted to crate private rights of action." *Cuyler*, 362 F.3d at 955.

The court also remarked, "It may be significant that since being

26

1-05-3718

enacted [almost 30 years ago], the abuse-notification statute has been amended several times, any one of which would have provided an occasion for plugging in a damages remedy had there been legislative sentiment for such a remedy; evidently there was not." *Cuyler*, 362 F.3d at 955.

In short, the federal appeals court rejected the plaintiffs' common law duty and statutory duty arguments, and there is nothing in its reasoning that supports the current plaintiffs' appeal. *Cuyler* is not a basis for concluding that Dr. Gomez owed a common law duty to his minor patient to detect a healed injury, to diagnose it as an indication of child abuse, and to report it as such to the minor's mother and child welfare authorities.

Rachel and Raynoldo quote extensively from the deposition testimony of Dr. Gomez, one of the hospital's nurses, and the parties' expert witnesses, and contend, "There really was no dispute as to the standard. Everyone agreed that *if child abuse was suspected* the standard of care required the abuse to be reported to DCFS, the police, and the parents." (Emphasis added.) In this case, however, Dr. Gomez did not discern the prior, healed injury to Raynoldo's ribs and Dr. Gomez had no suspicion of child abuse. Therefore, testimony regarding what should have been done "if child abuse was suspected" is irrelevant. We emphasize that Rachel and Raynoldo are not contending that Dr. Gomez misdiagnosed Raynoldo's intestinal colic in the emergency room on June 8, 1997, and that they have

27

no criticism of the physician's diagnosis and treatment of the intestinal colic.  Therefore, this case differs from instances such as *Cuyler*, where medical personnel discerned the symptoms of child abuse and suspected child abuse, but failed to report their suspicions to child welfare authorities, in violation of the Reporting Act.  *Cuyler*, 362 F.3d 949, 325 ILCS 5/1 *et seq.* (West 2002).  Rather, Rachel and Raynoldo are contending Dr. Gomez should have also discerned the five-to-eight-week-old rib fractures, recognized them as indications of child abuse, and reported them as such, in addition to diagnosing and treating the symptoms of intestinal colic.

The exception to the cited deposition testimony is Dr. Frank J. Baker's statement that Dr. Gomez's failure to discern the infant's healed rib fractures was in breach of the standard of care of emergency room physicians.  Dr. Baker is an emergency room physician and is the plaintiffs' retained expert witness.  Dr. Baker first offered this opinion on August 31, 2005, According to Dr. Baker, Dr. Gomez should have first considered the "bony structures" in Raynoldo's chest X ray, and if he had, "he would have seen the obvious abnormality."  Thus, Rachel and Raynoldo are effectively asking this court, on the basis of Dr. Baker's testimony, to create a new common law cause of action for violating the statute at issue.  They argue this is proper even though Illinois state and federal courts have soundly rejected previous attempts to imply a private cause of action from the

28

1-05-3718

statutory language (*North Central Behavioral Health Systems*, 352 Ill. App. 3d 284, 816 N.E.2d 4; *Cuyler*, 362 F.3d 949), and even though the Illinois legislature has subsequently met without amending the statute to create a private cause of action.  We have no legal basis or authority to create common law liability for a statutory violation.  Rachel and Raynoldo's common law action was based on the breach of a duty that does exist.

Since the plaintiffs would be unable to meet all the elements of their negligence action, summary judgment was properly granted for the defense.  Accordingly, we do not need to reach the plaintiffs' additional contentions that the defendants' conduct was the proximate cause of the physical abuse subsequently inflicted by Raynoldo's father.

The plaintiffs' last contention on appeal is that they should have been allowed to file their proposed third amended complaint, because it merely conformed the allegations with the opinion of their expert, Dr. Baker, which had been "fleshed out and crystalized at deposition."  The plaintiffs cite portions of Dr. Baker's deposition testimony indicating the emergency room personnel that worked on June 9, 1997, which was after Dr. Gomez's contact with Raynoldo on June 8, 1997, were liable for the injuries Raynoldo's father subsequently inflicted, because the personnel had not acted on the radiologist's June 9, 1997, report noting, "Old healed fracture at the lower left ribs appears to be involving the 7th, 8th and 9th ribs at the axillary

29

1-05-3718

area."

The circuit court has broad discretion as to whether to allow an amendment to a complaint, and its ruling on the plaintiff's request will not be disturbed on appeal absent an abuse of that discretion. *Charleston v. Larson*, 297 Ill. App. 3d 540, 555, 696 N.E.2d 793, 803 (1998). The following factors are relevant to our review of the circuit court's ruling: (1) whether the proposed amendment would cure the defective pleading, (2) whether the defendant would be prejudiced or surprised by the proposed amendment, (3) whether the proposed amendment is timely, and (4) whether the plaintiff had other opportunities to amend. *Charleston*, 297 Ill. App. 3d at 555, 696 N.E.2d at 803 (affirming denial of leave to amend where proposed amendment would not cure defective allegations as to duty of care and plaintiff had exercised previous opportunity to amend).

Since the proposed amendment does not indicate Dr. Gomez owed a common law duty to Raynoldo to warn or rescue Raynoldo from injuries that would be subsequently inflicted, the proposed amendment would not meet the first of these four factors. Accordingly, we conclude Rachel and Raynoldo have not demonstrated that it was an abuse of discretion for the circuit court to deny leave to file the proposed amendment.

Affirmed.

CAHILL, P.J. and JOSEPH GORDON, J., concur.

30